Roger H. Hoole (5089)
**HOOLE & KING, L.C.**
4276 South Highland Drive
Salt Lake City, UT 84124
Telephone: (801) 272-7556
Facsimile: (801) 272-7557
rogerh@hooleking.com

Attorneys for Plaintiffs Jasmin Davis and Barry Wilson

## IN THE THIRD JUDICIAL DISTRICT COURT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| JASMIN DAVIS and BARRY WILSON, <br><br> Plaintiffs, <br><br> vs. <br><br> THE STATE OF UTAH, and <br> THE UNIVERSITY OF UTAH, <br><br> Defendants. | **AMENDED COMPLAINT** <br><br> Tier 3 <br><br><br> Civil No: 160903643 <br><br> Judge: Sue Chan |

Plaintiffs Jasmin Davis ("Ms. Davis") and Barry Wilson ("Mr. Wilson"), hereby complain, allege and demand of Defendants as follows.

### TIER THREE LITIGATION

1.      Ms. Davis and Mr. Wilson designate this action, pursuant to Utah Rule of Civil Procedure 26(c)(5), as Tier 3 litigation with a damages range in excess of $300,000.

### JURISDICTIONAL ALLEGATIONS

2.      The facts and circumstances giving rise to this action occurred in Salt Lake County, State of Utah.

3.      Jurisdiction over Ms. Davis's and Mr. Wilson's claims against the State of Utah and the University of Utah is proper in this Court pursuant to Utah Code section 63G-7-501.

4.      Venue of Ms. Davis's and Mr. Wilson's claims against the State of Utah and the University of Utah is proper in this Court pursuant to Utah Code sections 63G-5-502 and 78B-3-307.

5.      Simultaneous with the filing of this Complaint, an undertaking in the amount of $300.00 was filed with the Clerk of this Court, pursuant to Utah Code section 63G-7-601.

## PARTIES

6.      Ms. Davis was hired by the University of Utah in or about August 2013 to work in the University Information Technology Department as the Vendor Manager.  She had responsibility for the Office of Software Licensing ("OSL").  Ms. Davis reported to Lisa Kuhn.   By March 2014, Ms. Davis was promoted to the position of Associate Director of Strategic Vendor Partnerships.  In addition Ms. Davis was tasked with several special, strategic projects for which she reported directly to Eric Denna, the Chief Information Officer, until his departure 30 June 2014.   Ms. Davis's employment was terminated effective 23 October 2015.

7.      Initially Mr. Wilson worked at the University of Utah as a contractor, after nine months, Mr. Wilson was offered and accepted a position in the University Information Technology ("UIT") Department as Senior Product Manager.  He began his employment with responsibilities over UIT's Fiber Team, and the Cellular/Distributed Antenna System ("DAS") on 1 July 2014.  Mr. Wilson reported to Michael Ekstrom for fiber optic cable management, installation and communication infrastructure and had a dotted reporting line to Ms. Davis for Cellular.  Mr. Wilson's reporting line to Ms. Davis was removed by Stephen Corbato on 3 November 2014, shortly before Mr. Wilson was terminated on 15 December, 2014.

8.      Defendant State of Utah ("Utah") is a governmental entity capable of being sued pursuant to Utah Code section 63G-7-401 et seq. and bears legal responsibility for the conduct of the University of Utah and its employees.

9.      Defendant the University of Utah ("University") is a Utah institution of higher learning and a public entity capable of being sued pursuant to Utah Code section 63G-7-401 et seq. The University receives funding from State of Utah and donors and is under the control of the Utah System of Higher Education and the State of Utah.

10.      At times material hereto, the University Information Technology Department ("UIT") was the central IT service provider for campus. UIT was responsible for many of the University's most critical common IT resources, including the campus network, the Campus Information Services ("CIS") portal, UMail, telephone, and online collaboration services, information security; software licensing, and other systems and applications.

11.      At times material hereto and ending on 30 June 2014, Eric Denna ("Mr. Denna") was UIT's Chief Information Officer and, on some projects as described below, Ms. Davis's direct supervisor.

12.      At times material hereto, and beginning after January 2015, Stephen H. Hess ("Mr. Hess") was employed as Chief Information Officer for the University. In this capacity, Mr. Hess was associated with addressing and coordinating Information Technology at the University.

13.      At times material hereto, Stephen Corbato ("Mr. Corbato") was employed as Deputy Chief Information Officer for UIT, served as temporary Interim Chief Information Officer for UIT, and served as temporarily Interim Director of the Center for High Performance Computing ("CHPC"), until his departure from the University in June 2015. As interim CIO, Mr. Corbato was responsible for aspects of the CIO role from 1 July 2014 until January 2015 when Mr. Hess was appointed CIO, after which Mr. Corbato stayed on as Deputy CIO, supporting Mr. Hess. As Director of CHPC, Mr. Corbato was associated with managing staff, work priorities and budgets for CHPC.

14.     At times material hereto, Lisa Kuhn ("Ms. Kuhn") was employed as Director of Finance within UIT.  In this capacity, Ms. Kuhn was associated with addressing and coordinating financial issues within UIT.

15.     At times material hereto, Michael Ekstrom ("Mr. Ekstrom") was employed as Director for Common Infrastructure Services within UIT.  In this capacity, Mr. Ekstrom was associated with addressing and coordinating Infrastructure installation and maintenance including, but not limited to, the campus-wide IT network and the fiber optic cable network at the University.

16.     At times material hereto, Caprice Post ("Ms. Post") was employed as Director of Unified Communications for UIT within the University of Utah.  In this capacity, Ms. Post was associated with addressing and coordinating aspects of phone/voice systems, email systems and certain indoor Distributed Antenna Systems ("iDAS").  Ms. Post's title was changed to Product Manager in or around April 2016 and her exact responsibilities in her new role are unknown.

17.     At times material hereto, Jim Livingston ("Mr. Livingston") was employed as a Director for the University Hospital Information Technology department and is now employed as Chief Technical Officer for UIT within the University. In this capacity, Mr. Livingston is associated with addressing and coordinating aspects of technologies that are common between the hospital and campus.

18.     At times material hereto, John Nixon ("Mr. Nixon") was employed as the Senior Chief Administrative Officer and Chief Financial Officer for the University of Utah.  In this capacity, Mr. Nixon was associated with addressing and coordinating aspects of administration and financial issues, including UIT, Human Resources and Purchasing, at the University.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

19.     Prior to the initiation of this lawsuit, and as required by the Utah Protection of Public Employees Act, Utah Code section 67-21-1 et seq. ("UPPEA") (Exhibit 1), Ms. Davis received a letter

(Exhibit 2) notifying her of her employment termination appeal rights and directing her to the University's website and grievance procedures, Policy 5-203 Staff Employee Grievances (Exhibit 3). Ms. Davis timely filed an appeal (Exhibit 4) with the University. A letter dated December 15, 2015 (Exhibit 5) announced the unsuccessful result of Ms. Davis's appeal. All conditions precedent to the institution of this lawsuit by Ms. Davis under the UPPEA have been fulfilled. This action is filed within 180 days of the exhaustion of Ms. Davis's administrative remedies. See Utah Code section 67-21-4(1)(b)(ii).

20. Mr. Wilson was prevented by the University from having any opportunity to file an appeal under the UPPEA when he was terminated; he was informed in a meeting with Mr. Ekstrom and University Human Resource representatives that, as a probationary employee, he had no appeal rights. The University did not send him a letter notifying him of his appeal rights and directing him to the Staff Employee Grievances Procedure, as it had Ms. Davis. The University's Staff Employee Grievances Policy (Exhibit 3) states that it "applies to all Full-time benefited and Part-time staff members of the University who have satisfactorily completed their probationary period." The University's stated policy and procedure are in conflict with the UPPEA which does not exclude from its protection "probationary" public employees. See Utah Code section 67-21-1 et seq.

21. Mr. Wilson therefore brings this action under the UPPEA. The University is estopped from asserting as a defense or otherwise that Mr. Wilson did not satisfy all conditions precedent to the institution of this lawsuit under the UPPEA, including, without limitation, the UPPEA's appeal requirement, the UPPEA's filing deadline for bringing this action, the shifting of the burden of proof to the public employer under the UPPEA, the substantial evidence burden of proof, statutory attorney fees and other provisions.

22.     Prior to the initiation of this lawsuit, Ms. Davis and Mr. Wilson timely served a joint Notice of Claim (Exhibit 6) under the Utah Governmental Immunity Act, Utah Code section 63G-7-101, et seq. ("UGIA") on the State of Utah and the University. This action is brought within one year of the State of Utah's and the University's denial of their Notice of Claim.  Accordingly, all conditions precedent for the institution of this lawsuit under the UPPEA, the UGIA, and common law have has been fulfilled.

## INTRODUCTION

23.     In the short period Ms. Davis and Mr. Wilson worked for UIT they communicated in good faith various violations of laws, rules, and regulations (often referred to below as violations of "policies") related to UIT's waste or misuse of public funds, property and manpower. Unfortunately, their good faith communications threatened certain UIT managers' lax and wasteful spending practices and embarrassed them because they were wittingly or unwittingly responsible for the violations and the resulting waste of public resources.  Although Utah law is specifically designed to protect public employees like Ms. Davis and Mr. Wilson from retaliation for their efforts to protect tax-payer dollars, these UIT leaders took adverse action against Ms. Davis and Mr. Wilson for speaking-up.  Ms. Davis was denied a promotion in August 2014 and terminated effective October 2015.  Mr. Wilson was similarly terminated in December 2014.

## GENERAL ALLEGATIONS

24.     As a public employer, the University may not take adverse action against a public employee because the employee communicates in good faith the waste or misuse of public funds, property or manpower ("waste or misuse" of public resources), or communicates in good faith a violation or suspected violation of a law, rule of regulation adopted under the law of Utah a political

subdivision or any recognized entity of the United States ("violation or suspected violation"). See Utah Code section 67-21-3(1)(a) (Exhibit 7).

25.     A public employee is presumed to have communicated in good faith if the employee gives written notice or otherwise formally communicates the waste of public resources or the suspected violation to a person in authority over the person engaged in the waste or misuse of public resources or the suspected violation or to the entity that conducts audits of the institution of higher learning where the employee is employed. See Utah Code section 67-21-3(1)(b).

26.     A public employer, such as the University may not take adverse action against a public employee because the employee has objected to or refused to carry out a directive that the employee reasonably believes violates a law or regulation of this state, a political subdivision of this state or the United States. See Utah Code section 67-21-3(3).

27.     A public employer, such as the University may not implement rules or policies that unreasonably restrict an employee's ability to document the waste or misuse of public funds, property or manpower; a violation or suspected violation of any law, rule, or regulation; or as it relates to a state government employer, gross misconduct, abuse of authority or unethical conduct. Utah Code section 67-21-3(4).

28.     Ms. Davis was hired in August 2013 to take control of the Office of Software Licensing ("OSL"). In that position, she was responsible for ensuring all approximately 40,000 staff, students and faculty remained in compliance of the software license agreements that she managed for UIT. Her responsibilities also included overseeing the OSL budget, staff, marketing, website, day to day operations, technical support, out-reach, escalations, vendor negotiations, executive support, reporting and agreement renewals. Ms. Davis had one staff member to assist her in OSL, Margaret Witbeck, who

had been with OSL for over 15 years. Ms. Davis hired Bill Lutz in June 2014 as Vendor Manager to improve compliance reporting and facilitate renewals.

29. As Mr. Denna, the Chief Information Officer ("CIO") became familiar with Ms. Davis's skills and experience, Mr. Denna and Ms. Kuhn, UIT's Director of Finance, directed that some special projects be managed by Ms. Davis, in addition to managing OSL.

30. In March 2014, Ms. Davis was promoted to Associate Director of UIT for Strategic Vendor Partnerships (formerly CIO special projects). Ms. Davis's role was also expanded to include improving cellular coverage for the entire University of Utah. She collaborated across all departments of the University, including the Hospital, Stadium and all affiliates (such as ARUP, Campus Bookstore, Continuing Education, etc.).

31. In addition, Ms. Davis was assigned several critical special projects by Mr. Denna, for which she had dotted line reporting directly to him. She was advised and understood that all of these projects potentially involved some level of waste or misuse of public resources. The special projects included:

     a. Review of several strategic agreements outside of OSL, including contracts with vendors such as Oracle, Kronos, Blackboard, for which Ms. Davis was credited with negotiating savings over five years of $3,200,000.00 (Exhibit 8). These long-term agreements may not have been reviewed in years and the University was paying for licenses, goods and/or services that it no longer needed. This waste and misuse of public resources was a cause of embarrassment to UIT leadership including, Mr. Hess and Ms. Kuhn, who had previously been responsible for these agreements and allowed them to become neglected.

     b. The sale/lease of space (Exhibit 9) at the Downtown Data Center ("DDC") because it was a money-pit as more particularly alleged beginning at paragraph 128. This project

was discussed and agreed by Mr. Denna with Ms. Kuhn and Mr. Corbato. Ms. Davis's effort to reduce the waste was later discovered to be a cause of embarrassment for Mr. Corbato, Ms. Kuhn, Mr. Ekstrom, Ms. Post and Mr. Livingston as they all played a critical role in acquiring the DDC in 2008 and 2009.

      c.     The negotiation of a new campus-wide agreement with Adobe covering all of the University's approximate 40,000 staff, students and faculty. This was a cause of embarrassment for Ms. Kuhn because the final agreement (Exhibit 10). Ms. Davis negotiated represented more than $200,000.00 savings per year compared to the price previously negotiated (Exhibit 11) by Ms. Kuhn.

      d.     Improvement of campus-wide cellular coverage because a vendor, Crown Castle, had not delivered on its promises to provide campus-wide coverage, rendering the campus under-served in terms of cellular and 911 coverage. This was a cause of embarrassment for Mr. Hess, Mr. Corbato, Ms. Post and Mr. Ekstrom as they had responsibility for the Crown Castle relationship and had been receiving complaints about poor coverage and 911 responsiveness that they had failed to address.

      e.     Project review of the Voice-over-Internet Protocol ("VoIP") (Exhibit 12) because Ms. Post had completed a VoIP Request for Information ("RFI") but appeared to have unilaterally decided to purchase of Avaya VoIP handsets at a cost of approximately $600.00 each representing suspected waste and misuse of public resources. Ms. Post did this without completing adequate coordination with the campus on their needs, without formulating a VoIP business plan (with total cost of ownership including 5 year projections of cost for all equipment, network upgrades and on-going maintenance) approved by University governance committees, and without issuing a Request for Proposal ("RFP") to VoIP vendors, such as Cisco, Microsoft

and others, in compliance with University and Utah purchasing policies and procedures. This was a cause of embarrassment for Mr. Corbato, Ms. Post, Ms. Kuhn and Mr. Ekstrom because they had shared responsibility to produce a VoIP RFP and successfully launch VoIP campus-wide with transparency on costs and vendor selection process in accordance with University and Utah purchasing policies and procedures, but failed to do so.

      f.     Negotiation and execution of an agreement with a vendor called BOX to provide online storage. This was a cause of embarrassment to Ms. Post and Mr. Corbato who had failed to complete an agreement in over 12 months. This was a high priority because the delays had become an embarrassment for UIT. The University Hospital was putting pressure on UIT to get this signed as they wanted to reduce their risk of HIPAA information being stored in personal non-HIPAA compliant accounts such as Dropbox, and wanted to standardize on BOX, which was HIPAA compliant. Ms. Davis was able to get the BOX Agreement (Exhibit 13) completed and signed within 3 months.

32.     Mr. Wilson was introduced to Ms. Davis by Ms. Anita Sjoblom, a UIT employee who had been working with Mr. Wilson. Mr. Wilson had worked on and off across the University Campus and Hospital since 1989. For nine months prior to joining the University's UIT group, Mr. Wilson was employed by HNM Systems where he supported some of Crown Castle systems and regularly interacted with UIT staff and leadership. Between March 2014 and June 2014, Ms. Davis relied on Mr. Wilson's knowledge of the campus and its cellular network and was impressed by his unique technical skills. Ms. Davis recommended to Mr. Denna and Ms. Kuhn that UIT open a position for an engineer with Mr. Wilson's skillset who could assist Ms. Davis with the campus-wide cellular coverage plan. Ms. Davis was concerned that vendors such as Crown Castle had been taking advantage of the University, because UIT lacked employees with the technical ability to quality check Crown Castle's work and to ensure it

provided equipment and services in compliance with university purchasing and financial & business policies.

33.     Mr. Denna and Ms. Kuhn agreed with Ms. Davis's recommendation and a position was opened.  Mr. Wilson had identified technical solutions during the previous nine months and was asked to apply for the position as the University's Cellular/DAS Manager.  Ms. Davis assisted Human Resources with the job description (Exhibit 14) and the position was published by Human Resources.  Mr. Wilson applied for the position and was interviewed by Mr. Ekstrom (Director of Campus Information Systems) twice and was introduced to Ms. Kuhn during the interview process.   Mr. Wilson was offered the position by Mr. Ekstrom and accepted effective 1 July 2014.  Mr. Ekstrom increased Mr. Wilson's responsibilities to also include the UIT Fiber Manager role and selected the title of Sr. Product Manager UIT.

34.     Shortly after Mr. Wilson was employed, he began demonstrating how UIT could become more efficient, reviewed long standing relationships and agreements with outside vendors, and worked to do so in compliance with State and University standards.

35.     Ms. Davis and Mr. Wilson reported violations or suspected violations of laws, regulations or rules pertaining to the waste or misuse of public resources in connection with a $150,000.00 Fabricated Purchase Order for Americom (see paragraphs 54 through 73); Failure to Charge for Power Bills (see paragraphs 74 through 82); Unnecessary DAS Expenditures (see paragraphs 83 through 111); Unauthorized Amendment to Campus-wide DAS/Lease Agreement (see paragraphs 112 through 126); The Downtown Data Center Money Pit (see paragraphs 127 through 140); Improperly Steering a purchase of Azure (see paragraphs 141 through 163); and Man Hole and Communications Security (see paragraphs 164 through 191).

36.     Mr. Wilson and Ms. Davis noticed other violations of State and/or University policies and procedures as well, and tried to report their concerns with their immediate supervisors, Mr. Ekstrom and Ms. Kuhn respectively.

37.     Mr. Corbato had previously told Mr. Ekstrom and Ms. Kuhn not to raise issues because he was trying to secure a promotion to Chief Information Officer ("CIO") and did not want problems getting in the way.  This concerned Ms. Davis and Mr. Wilson because of what they were discovering by way of waste and misuse of public resources and their responsibility to bring those problems with proposed solutions to their supervisors.

38.     Initially, when they reported their concerns to their immediate supervisors, they were told that all of their concerns would be addressed.  Once it became clear to Ms. Davis and Mr. Wilson that their supervisors didn't plan to address their concerns, they escalated their concerns to the next level of management, Mr. Corbato in late September 2014, as required.  Despite multiple emails to Mr. Corbato, he ignored the requests for a meeting.  Realizing that University policy (Exhibit 15) required them to report their unaddressed concerns to the next level of management, on October 6, 2014 (Exhibit 16) they initially met with John Nixon, the University's Chief Business Officer, to present a book of their concerns and to request employment protection.  Then on 30 October 2014, Ms. Davis and Mr. Wilson met again with Mr. Nixon to provide him with more information.

39.     Embarrassed, UIT leadership was obviously displeased with both Ms. Davis and Mr. Wilson, and retaliated against them.  Ms. Davis was denied a promotion and salary adjustment after being questioned by Ms. Kuhn whether "a pay raise and promotion would make [Ms. Davis] happy" and whether Ms. Davis "had [Ms. Kuhn's] back?"  In response, Ms. Davis asked "when have I not had your back?" and Ms. Kuhn said "well when you went to John."  The promotion and raise were never given.  Ms. Davis unsuccessfully sought help (Exhibit 17) from Mr. Van Dyke.  Later, on 30 October 2014, Mr.

Corbato told Mr. Ekstrom in the presence of Sylvia Jensen, Associate Director of IT for the School of Medicine, as reflected in the IA at Concern # 58 (Exhibit 18), that Mr. Wilson was a "cancer that needed to be cut out." Then on 3 November 2014, Mr. Corbato changing Mr. Wilson's reporting line (Exhibit 19) so that Mr. Wilson would no longer report to Ms. Davis. Ms. Davis was concerned that the change in Mr. Wilson's reporting line meant that she would not be able to protect Mr. Wilson from retaliation leading to wrongful termination.

40.     Realizing that their employment was now at risk, they again met with Mr. Nixon on 30 October 2014 and then emailed (Exhibit 20) him seeking employment protection on 17 November 2014. In response to the email, Mr. Nixon wrote (Exhibit 20): "Thanks for your email. I did have a talk with Steve [Corbato] about the situation and I asked him to hold off in doing anything with you or Barry until we get the new CIO on board. At that point, we will evaluate where your shop should reside. Until then, I need to ask you to continue working with the [U]IT team within the org structure they have established. We have a lot of work to do." This further embarrassed Mr. Corbato.

41.     Soon after the second meeting with Mr. Nixon, Ms. Davis was told by Jill Brinton, another Associate Director in UIT, that Mr. Hess claimed "Jasmin had killed Steve Corbato's chances for promotion to CIO." Although Mr. Corbato and other UIT leaders were upset with Ms. Davis and Mr. Wilson for their compliance efforts, UIT managers as well as other co-workers across campus had sent them numerous unsolicited emails (Exhibit 21) and letters (Exhibit 22) describing their wins and success (Exhibit 23) for UIT. They also received letters (Exhibit 24) of appreciation (Exhibit 25) from other universities that they had assisted.

42.     Despite seeking employment protection from Mr. Nixon, in a meeting on 21 November 2015 with Mr. Corbato, Ms. Kuhn and Mr. Ekstrom, in which Ms. Davis and Mr. Wilson had to defend themselves and explain the success they were having, Mr. Wilson said "no one has brought UIT more

wins than the two of us" to which Mr. Corbato looked at Mr. Wilson and said "that is exactly the problem. It cannot be Barry and Jasmin five and everyone else zero." Indeed, that was the problem, these UIT leaders were embarrassed because the unexpected consequence of Ms. Davis's and Mr. Wilson's successes was causing their failures to come to light, making them look bad and threatening their ability to cut corners. Mr. Corbato was also angry that Ms. Davis and Mr. Wilson had gone over his head to Mr. Nixon and stared at Mr. Wilson with his lip quivering and visibly shaking while he was saying this. Mr. Corbato threatened: "now that I'm no longer in the running [for CIO], I'm going to be making some changes around here."

43. Mr. Wilson was terminated on 15 December 2014. He was called into a meeting with Mr. Ekstrom, Lora Mortensen and one other HR representative and given a termination letter from Mr. Ekstrom in which Corbato concurred. The letter (Exhibit 26) stated: "It has been my observation that you are Mr. unwilling to collaborate with co-workers and colleagues throughout campus in a collegial manner." When Mr. Wilson stated he wanted to appeal UIT's decision, because he clearly felt he was being terminated for voicing concerns that embarrassed UIT leadership, he asked what appeal rights were open to him. He was told there were none, and his only option was to "get a lawyer." His laptop, access badge and keys were taken from him and he was escorted off the premises.

44. Simultaneously and without prior notice, Ms. Davis was called into a meeting with Mr. Corbato and Jeff Herring (Chief Human Resources Officer) who explained that Mr. Wilson was being terminated. Ms. Davis questioned why and whether Mr. Nixon was aware. Mr. Herring replied that he was representing Mr. Nixon in this discussion. Ms. Davis stated they were making a mistake. After the meeting, Ms. Davis sent a detailed email (Exhibit 27) to Jeff Herring explaining her concerns with the termination, which she was having difficulty reconciling, and requested information justifying the termination, but she never received that information from Mr. Herring (Exhibit 28).

45.    Mr. Wilson's termination deepened Ms. Davis's concerns for at-risk employees installing cable in enclosed spaces without required training and safety protection and for her own position. She believed certain UIT leaders had conspired to terminate Mr. Wilson to silence him, and would likely do the same to her. She therefore met with Mr. Hess after he was appointed as the new CIO in January 2015 and delivered to him a copy of the book (Exhibit 16) she and Mr. Wilson had compiled for Mr. Nixon, and a second book (Exhibit 29) that included her concerns with UIT leadership and the wrongful termination of Mr. Wilson. Mr. Hess assured Ms. Davis that he would look into all of her concerns.

46.    In January 2015, after Mr. Wilson was terminated and before Ms. Davis was terminated, Mr. Wilson attempted to bring his and Ms. Davis's concerns to the Utah State Auditor. After speaking with a representative, he completed, as requested, a Utah online questionnaire (Exhibit 30) and then waited for a response. On 29 April 2015, the State Auditor instructed Mr. Wilson to trigger an internal audit at the University, which Mr. Wilson did in early May 2015 by filling out a University online questionnaire (Exhibit 31).

47.    Ms. Davis was concerned that without Mr. Wilson there to protect the Fiber Team, they would once again be directed to perform at-risk fiber installations in the unsafe manholes, steam tunnels and enclosed spaces without the necessary training and safety equipment. Due to this concern and because Mr. Hess had failed to address Ms. Davis's concerns of the waste and misuse of tax-payer dollars contained in the 2 books delivered to him, she joined Mr. Wilson's efforts. In May 2015 she went, over the objections of Mr. Hess and Ms. Kuhn, to Internal Audit, which is part of the University's Risk Management Office, with three of her concerns and discussed the rest with IA in 2 meetings in May: submitted complaints, May 2015 (Exhibits 32, 33 and 34).

48.    On 20 July 2015, Ms. Davis also was told by Ms. Kuhn in the presence of Ms. Mortensen of Human Resources that she was aware of the Internal Audit complaints submitted by Ms. Davis, and

was given a Letter of Expectation (Exhibit 35) that cautioned Ms. Davis about her communications. Previously, Ms. Kuhn had also told Ms. Davis that she was aware that Ms. Davis had escalated UIT leadership concerns to Mr. Nixon and she asked Ms. Davis if "she [Ms. Davis] had her [Ms. Kuhn's] back." Again, the University did nothing to protect Ms. Davis from her supervisor, Ms. Kuhn, even though many of the concerns Ms. Davis had raised involved Ms. Kuhn.

49.     As feared, Ms. Davis was terminated on 22 September 2015 as confirmed by a letter (Exhibit 2) from Ms. Kuhn and Mr. Hess.  Ms. Davis's laptop, access badge and keys were taken from her and she was asked to immediately clean out her office, while being supervised by Ms. Mortensen. Ms. Mortensen escorted Ms. Davis off the premises.  Ms. Davis was told that her position was being "riffed" following a "re-org" within UIT, but she later learned that no other UIT staff were riffed and the re-org only applied to her position.  Thus, the only position riffed was that of the person that reported and tried to resolve UIT's embarrassing compliance problems and wasteful practices.

50.     On 1 October, 2015, Ms. Davis independently contacted the State Auditor in support of the earlier contact on her behalf by Mr. Wilson in May 2015.  At the suggestion of the State Auditor, on or about 21 October 2015, Ms. Davis also reported her OSHA concerns to Utah OSHA by completing their online questionnaire.

51.     Despite being afforded the legal protections of the UPPEA, as well as Utah OSHA, Utah Code section 34A-6-203(1), against retaliation for voicing their concerns, Ms. Davis and Mr. Wilson were terminated because they had communicated in good faith the waste and misuse of public funds, property or manpower and had communicated in good faith violations or suspected violations of laws, rules or regulations by UIT.   In addition, Mr. Wilson continued to be retaliated against by UIT leadership after his termination as evidenced by Ms. Kuhn's email (Exhibit 36)  Robbie Sokol's (Exhibit

37) email and Mr. Wilson's early termination from contract work with Auxiliary Services he undertook in July 2015.

52.    In an effort to justify these terminations, the University's internal audit "investigation" was conducted by Randy Van Dyke---the University's Risk Manager---under the direction of the University's General Counsel.  The Internal Audit report ("IA") (Exhibit 38) was compiled over a period of five months and was eventually released on 15 October 2015.  Ms. Davis and Mr. Wilson had been directed by the Utah State Auditor's Office to bring their concerns to the University Audit Department and participated in good faith throughout the process.  As alleged below, however, the IA turned out to be an attempt at damage control (Exhibit 39) by Risk Management and University General Counsel.  While the IA acknowledges the need for corrective action by UIT, glossy and deflective language from the Risk Management team downplayed the violations, excused the waste, and attempted to justify the adverse action taken against Ms. Davis and Mr. Wilson.

53.    After Mr. Wilson's termination, he requested information about the IA and was told via email (Exhibit 40): "Since we are conducting our inquiry under the direction of OGC we are not at liberty to provide you with any feedback regarding our work."  The IA is not an independent audit.  It was born and bred in a conflict of interest and its contents reflect that bias.  In addition to attempting to sidestep and downplay Ms. Davis's and Mr. Wilson's concerns, much of the IA, including its last 10 "Concerns" (Exhibit 38), is an attack on the messengers and an attempted justification of their terminations.  The IA seeks to make up for a lack of any prior human resource discipline and, on information and belief, was written in anticipation of this litigation.  Unsurprisingly, the University is now claiming that the IA supports its terminations (Exhibit 41).

54.     Mr. Wilson and Ms. Davis have suffered serious economic and emotional injuries. This lawsuit seeks to redress the harm suffered by them and to shed light on the waste and misuse of public resources resulting from UIT's violation of law, regulations and policies.

**$150,000 FABRICATED PURCHASE ORDER FOR AMERICOM**

55.     Part of Mr. Wilson's duties included working with Purchasing for soliciting bids from vendors for work that needed to be done on the University's campus.  The governing policy (Exhibit 42) requires competitive bids be obtained.  If the cost for the services was less than $1,000.00, Mr. Wilson was authorized to submit a purchase requisition to the UIT accounting department under his own signature with the lowest bid attached.

56.     In September of 2014, Mr. Wilson and his team were obtaining bids for fiber cable to be installed at the School of Dentistry.  The lowest bid was from Americom in the amount of $1,002.24, which was above Mr. Wilson's signing authority.  He therefore followed University policy and obtained approval from his supervisor, Mr. Ekstrom, to submit the purchase requisition (Exhibit 43).

57.     Mr. Wilson submitted the necessary documentation with the purchase requisition to Cathy Andersen in the UIT accounting department.  The UIT accounting department changed the purchase requisition (Exhibit 44) from $1,002.24 to $150,000.00 without Mr. Wilson's knowledge, and submitted it to the University purchasing department without the lowest bid attached and without an adequate description of the goods or services being purchased.  UIT accounting also inserted Mr. Wilson's name in the altered purchase requisition as the "requestor," without his knowledge or consent.

58.     On October 6, 2014, the University purchasing department, in turn, prepared a purchase order for $150,000.00 using Mr. Wilson's name and issued the purchase order to Americom, which contacted Mr. Wilson on October 8, 2014 and questioned why it had received a blanket $150,000.00 purchase order with a vague description of goods or services.  Mr. Wilson advised Americom that he

had no knowledge of the purchase order and did not know why it had his name on it but would look into it. Americom then sent Mr. Wilson a copy of the purchase order (Exhibit 45).

59. Mr. Wilson received the purchase order and confirmed that he was indeed listed as the requestor on the $150,000.00 purchase order. Mr. Wilson was alarmed, not just because his name had been used to fabricate a purchase requisition, but also because University purchasing policy requires the completion of requisition forms detailing the purchased goods and services with attached copies of the bids further describing the goods and services. The fabricated purchase requisition merely stated "Labor for fiber" and "Labor for Cable." Mr. Wilson escalated his concerns to Mr. Ekstrom, but Mr. Ekstrom did nothing to support Mr. Wilson as shown in their email exchange (Exhibit 46). Mr. Wilson also consulted with Ms. Davis who instructed Mr. Wilson to go to the University purchasing department to get the purchase order canceled.

60. Mr. Wilson contacted the University's purchasing department as directed and told them that his name should not have been used on the vague purchase requisition and was assured (Exhibit 47) that a change order would be submitted to remove his name from the purchase order. Soon thereafter, on October 17, 2014, the UIT accounting department canceled (Exhibit 48) the purchase order altogether.

61. While Mr. Wilson was pursuing the $1,002.24 purchase requisition and before it was fabricated (Exhibit 49) by Ms. Kuhn's accounting team into a $150,000.00 purchase order, the sales representative for Americom, Mike Herd, told Mr. Wilson, and later also told Ms. Davis, of his concern that the University had a "special relationship" with Cache Valley Electric who received the majority of the University's orders for cabling work, and that Americom, despite being the State Awardee based on their lower pricing, was receiving very few orders from the University and not getting "a fair shot."

62.     Ms. Davis and Mr. Wilson approached Ms. Kuhn about Americom's assertion, from Americom and when he requested that Ms. Kuhn check the numbers, Ms. Kuhn agreed to look into how much was spent with both vendors.  Mr. Wilson also informed Ms. Kuhn that Americom may submit a complaint.  Ms. Kuhn seemed troubled by this and stated that "if Americom complains, we just won't use them again."  Ms. Kuhn did not provide the comparison data between Cache Valley Electric ("CVE") and Americom, as requested, but one of her accountants, Brandon Zimmerman, confirmed to Mr. Wilson, that Cache Valley Electric did indeed get most of UIT's business ("the lions share").

63.     When Mr. Wilson tried to discuss (Exhibit 50) this apparent bias against the lower-priced State contract awardee, Mr. Ekstrom stated; "Without Lisa's [Kuhn] and Bob [Tiney's] support, I don't have a leg to stand on to force this, unless we can show the CVE does unsatisfactory work or the costs are much higher and I make it a CIS standard and take it to a lower level than UIT."  Mr. Wilson provided the cost differences showing, for example, the Cache Valley Electric ($42.00 per/hour) had a higher labor rate than Americom ($37.00 per/hour). Mr. Ekstrom simply refused to talk about it, assured Mr. Wilson that he had talked with Ms. Kuhn, and suggested Mr. Wilson would need to address his concerns with Ms. Kuhn.

64.     After the $150,000.00 purchase order was canceled, Mr. Wilson began feeling pressure from UIT leadership to allow his name to be used on purchaser orders and to cooperate in submitting purchase requisitions above his signing authority.  He resisted this pressure and tried to avoid a meeting at which he would be further pressured as reflected in the following email exchange on 28 October 2014:

> Hello Lisa / Peter,
>
> I don't feel a meeting is necessary if you could please just send me the process for submitting PO's against Solicited Funds projects. I just have to be very careful, my wife works for the IRS (15 years) and my family owns McFadden Corp (CPA firm Mike

McFadden is the president of the PA CPA association). If there were ever a problem my wife would lose her job and we could suffer as a firm.

Barry Wilson
Sr. Product Manager, IT – Fiber / RF / DAS

65.     Ms. Kuhn insisted on having a meeting which Mr. Wilson attended, along with Peter Panos.  During this meeting, Ms. Kuhn denied that the Americom purchase order had been fabricated by her team, leading Mr. Wilson to send Ms. Kuhn a copy of his email exchange (Exhibit 49) with Ms. Kuhn's accountants.

66.     When submitting the $1,002.24 purchase requisition Mr. Wilson followed the University's purchasing process as set forth in its policies.  Later, UIT leadership wanted him to follow a different (undisclosed) UIT processes.  Despite Mr. Wilson's written request that UIT leadership send him the UIT process, he was never provided with it.  UIT leadership, however, made it increasingly clear to Mr. Wilson by its actions and comments that they were not happy with his determined efforts to comply with University purchasing policies or his discussion with University Purchasing.  By 30 October 2014, Mr. Wilson was branded by Mr. Corbato as a "cancer that needed to be cut out" violating the University Code of Conduct that establishes expectations of proper conduct and University values, including the practice of "respect by treating others with civility and decency".

67.     UIT leadership had also complained to Ms. Davis about Mr. Wilson and the fact that the University Purchasing Department was now clamping down on UIT.  Ms. Davis felt obliged to explain to UIT leadership her involvement with Mr. Wilson in halting the fabricated purchase order, and her support for Mr. Wilson's compliance with University policies.     On 6 October 2014, they met with Mr. Nixon under a University policy (Exhibit 15) which required the escalation of suspected waste or misuse of public resources.

68.     UIT leadership was aware that Mr. Wilson and Ms. Davis had met with Mr. Nixon, and had given him documents supporting their concerns.  Ms. Davis and Mr. Wilson had informed Mr. Nixon of the complaint from Americom, the resulting fabricated $150,000.00 purchase order for Americom, and a blanket $50,000.00 purchase order for Cache Valley Electric, which they had also discovered and which they also believed circumvented University purchasing policies, in favor of an evidenced special relationship with Cache Valley Electric.

69.     The $50,000.00 blanket purchase order had David Kosanke's name on it indicating he was the requestor or procurement agent (Exhibit 51)  Mr. Kosanke had accepted gifts from Cache Valley Electric over the years, as supported by the IA.  Mr. Kosanke was able to keep the $50,000.00 PO replenished with assistance from Ms. Kuhn, who had her accountants move funds (Exhibit 52) to repeatedly replenish the $50,000.00 PO, thus allowing Cache Valley Electric to have an "open purchase order" against which they could bill any work they did for UIT.

70.     UIT did not follow the state-established processes for creating work orders in order to bill against blanket purchase orders. This compounded Ms. Davis's and Mr. Wilson's concerns over lack of controls related to preventing waste and misuse of public funds.  The state contract calls for work orders (Exhibit 53) to be produced and sent to vendors that have a state contract.

71.     On information and belief, UIT circumvented purchasing policies (Exhibit 54) and procedures for competitive bids for personal reasons and did not complete written cost benefit analyses (Exhibit 42) as required for not using Americom---the state contract awardee, and typically gave the work to their preferred vendor---Cache Valley Electric, despite there being a negotiated state contract in place with Americom which had lower labor rates than Cache Valley Electric.

72.     The Internal Audit or IA "found that a UIT accountant did change the amount from an initial $1,001 [actually, $1,002.24] to a blanket PO in the amount of $150,000.00.  See Concern # 48

(Exhibit 171). "UIT management stated that this was an error and subsequently closed the purchase order (as of June 30 2015)." But despite the acknowledged errors and recommendations for corrective measures, the IA concluded: "Changing a $1,001 Americom Purchase order to a $150,000.00 **blanket** order was allowable and did not impose any additional procurement requirements since the vendor held a state contract." (Emphasis added).

73.     The IA's conclusion incorrectly conflates Mr. Wilson's request for a specific purchase order for labor in the amount of $1,002.24 for a "fiber backbone pull from Dental into [the] cadaver [building]" with a so called "blanket" $150,000.00 PO for "Labor for fiber" and "Labor for Cable." This modification of Mr. Wilson's PO request was more than a mere error. Issuance of such a PO was contrary to established purchasing policies. For example, purchasing policy 3-100C (Exhibit 55) states: "Blanket orders may not be used to purchase capital equipment . . . or single invoices billing in excess of $5,000 unless authorized on the order by the Purchasing Department." No such authorization appears on the $150,000.00 PO (Exhibit 45). In addition, Policy 3-100D (Exhibit 56)states:

Blanket Orders

1.   Blanket orders are intended for use when **multiple orders** are made to the same supplier [of products] during the course of a year. Multiple payments are allowed on a blanket order.
2.   Organizational units shall submit a requisition to the Purchasing Department for competitive and non-competitive blanket orders.
3.   **Non-competitive blanket orders shall not exceed the formal purchase threshold.** Approval of a non-competitive blanket order request is at the discretion and the sole responsibility of the Purchasing Department.
4.   Competitive blanket orders may be renewable multi-year agreements for the total price specified in the solicitation. (Emphasis added).

Here, there were not "multiple orders." Only one request for $1,002.24 for specific labor on one project was submitted. And the $150,000.00 PO exceeded the $5,000.00 purchase threshold for non-competitive blanket orders. Policy 3-100D (Exhibit 56) further states:

Procurement Thresholds

1.  Single procurement threshold: $5,000
2.  Formal purchase threshold: $50,000
3.  Professionals, providers and consultants threshold: $100,000
4.  The Director of Purchasing and the Vice President for Administrative Services
    may establish an annual cumulative threshold through a Memorandum of
    Understanding.

74.     Mr. Wilson would never have known of the $150,000.00 PO if Americom had not called

nervously to ask him what the PO was for.  Mr. Wilson was understandably alarmed by the fabricated

PO because not only did he suspect UIT of violating purchasing policies and causing a waste or misuse

of public resources, but because UIT did so under his name.  He believed, based on his growing

experience as a University employee, that UIT fabricated the $150,000.00 PO under his name in an

effort to compromise his employment because his compliance with University policies was threatening

some UIT leader, and according to Mr. Ekstrom, Mr. Wilson should have left it alone because it made

UIT look bad.  Later, Ms. Kuhn also tried to blame Mr. Wilson, claiming that he had wanted the

$150,000.00 PO.

## FAILURE TO CHARGE FOR POWER BILLS

75.     Between 1998 and 2012 the University entered into contracts with T-Mobile and Sprint

that allowed these cell phone carriers to service their customers by installing transmission equipment on

the University's campus.

76.     The contracts were managed by UIT and provided revenue for the University.  The

contracts required T-Mobile and Sprint to pay the University for the cost of the electrical power used to

service their transmission equipment.  To fulfill this contractual provision, UIT leadership should have

insisted that utility meters be installed by the carriers at the carriers' transmission equipment sites so that

the carriers could be billed for their use of electricity.

77.     After Mr. Wilson was employed by the University in July 2014, he discovered that no utility meters were installed for the transmission equipment.  Mr. Wilson and Ms. Davis then reviewed the T-Mobile and Sprint contracts, investigated and confirmed that the University had been paying the utility costs, when those costs should have been borne by the carriers.  Mr. Wilson and Ms. Davis further investigated and learned that during the years the contracts had been in place and managed by UIT leadership the carriers had never been billed for any of the utility expenses.  Instead, the power bills were paid with tax-payer dollars.

78.     When this waste of public resources was brought to the attention of UIT leadership by Mr. Wilson and Ms. Davis, it was dismissed by Mike Ekstrom and Caprice Post, even though UIT leadership is required to protect the University resources as stated in multiple University policies, starting with the University Code of Conduct, Stewardship of University Assets policy (Exhibit 57). Despite the indifference of Mr. Ekstrom and Ms. Post, Mr. Wilson and Ms. Davis continued to work to correct the problem.

79.     Because UIT management had dismissed their concern about the waste of University and State resources, Mr. Wilson and Ms. Davis followed the Ethical Standards and Code of Conduct, Ethics and Compliance Reporting guidelines (Exhibit 15) which state:

> Any dishonest or improper act by an employee (i.e. that violates the law, wastes money, or endangers public health or safety) is of great concern to the University.  All employees are encouraged to report suspected improprieties to their supervisor, or directly to a higher level if the supervisor is involved.

> Accordingly, and as detailed above, they reported their concerns about this waste of resources to their immediate supervisors first, then attempted to bring the concern to Mr. Corbato, who refused to meet, and therefore brought the concern to the next level, John Nixon.  Ms. Davis also brought the concern to Steve Hess, after Mr. Wilson's employment was terminated.

80.     After Mr. Wilson was fired, Ms. Davis completed the implementation of the solution she and Mr. Wilson had pursued together with T-Mobile and Sprint, resulting in the University recouping $75,859.02 (Exhibit 58) in past utility expenses and projected revenues of $55,582.92 (Exhibit 58) for future power consumption over the next 10 years.

81.     Mr. Wilson had also brought a similar problem involving the utility costs of Crown Castle's transmission equipment to Mr. Ekstrom, Ms. Post and Ms. Davis, and Ms. Davis further discussed this problem with Ms. Kuhn, Ms. Post and Mr. Hess.  UIT leadership's response, like its response to the T-Mobile and Sprint utility cost problem, was dismissive.  A solution to the Crown Castle waste of University and State revenues was being pursued by Ms. Davis, but was not completed before UIT leadership terminated Ms. Davis's employment, claiming her position as Associate Director of Strategic Vendor Partnerships was not needed.  On information and belief, the University has yet to recover its past expenditures and has yet to take steps to avoid unnecessary future losses.

82.     Mr. Wilson and Ms. Davis's exposure of, and effort to correct, the waste of University and Utah resources by UIT leadership's failure to collect utility expenses from T-Mobile, Sprint and Crown Castle offended UIT leadership because of their failed oversight and caused resentment toward Mr. Wilson and Ms. Davis, as evidenced by the dismissive reaction of UIT leadership.  Mr. Wilson and Ms. Davis were simply performing the functions for which they had been hired.

83.     UIT leaders made them aware that no matter how respectfully and carefully Mr. Wilson and Ms. Davis presented this, and their other concerns, UIT leadership felt challenged by Mr. Wilson's and Ms. Davis's work because it exposed their incompetence and the waste of past years and because Mr. Wilson and Ms. Davis's work questioned the cozy relationships between UIT leadership and the favored vendors (Exhibit 65) they protect.

84.     The University's IA addresses UIT's failure to charge for power bills by re-stating Ms. Davis's and Mr. Wilson's concern as Concern # 53 (Exhibit 59) in this way: "Wireless carriers are not paying for electricity used for their cell towers located on campus.  Mike Ekstrom and Lisa Kuhn were not interested in charging the carriers for electricity because the funds would have to be passed along to Facilities and not stay in UIT."  This concern should have been stated in the IA as follows: "Wireless carriers, **Sprint and T-Mobile, had not, and Crown Castle is** not paying for electricity used for their cell **equipment** located on campus buildings.  ***Ms. Davis's and Mr. Wilson's efforts to correct this problem, particularly as it related to Crown Castle, had been stubbornly resisted by UIT management and Ms. Davis's efforts to correct the problem as to Crown Castle were still being resisted.***  Mike Ekstrom, Ms. Post and Lisa Khun **had not been** interested in charging the carriers, ***particularly Crown Castle***, for electricity because the funds would have to be passed along to Facilities and not stay in UIT."

85.     The IA states that the "University does receive payments from Crown Castle."  This statement is true as far as it goes, but, to the extent it suggests that the University also received the required payments for its utility expenses, it is false.  Since 2006, under the Crown Castle Agreement (Exhibit 90), the University has been entitled to receive payments for the utility expenses associated with Crown Castle's equipment.  As of the respective employment terminations of Mr. Wilson and Ms. Davis, these uncollected expenses had still not been collected from Crown Castle.

86.     Before Mr. Wilson's termination, he discovered that a meter actually had been installed years earlier on Crown Castle's equipment, but that the meter had been wired incorrectly and was flashing the error message "Out of Phase" and was not functioning.  Mr. Wilson had the meter rewired so that the utility expenses could be monitored for 30 days allowing the past monthly expenses to be calculated and billed to Crown Castle.  That monitoring was not completed as of the time of Ms. Davis's

termination. On information and belief, since her termination, Crown Castle, has still neither been billed by the University for its past due utility expenses, nor is it being billed for its ongoing utility expenses.

87. The IA takes credit for the University by stating that the "University is ***currently*** working with the carriers to obtain payment for electricity used as well as back payment for previous use." Id. (emphasis added). However, by the time Ms. Davis and Mr. Wilson first raised the concern that their efforts to solve this problem had been met with stubborn resistance, they had already, despite that resistance, successfully placed meters on the carriers' equipment (Sprint and T-Mobile), calculated the past due utility expenses and collected all of the past due payments from the Carriers in the approximate amount of $75,000.00 in past due expenses from Sprint and T-Mobile.

88. The Conclusion to Concern # 53 confirms that Ms. Davis's and Mr. Wilson's efforts to collect the past and future utility expenses was meritorious, but misstates how UIT reacted to their concern. The IA claims: "UIT took appropriate action regarding this concern when it was brought to their attention." Again, Ms. Davis's and Mr. Wilson's stated concern was that UIT management had not taken appropriate action and that their work to fix the problem was resisted by UIT management, particularly, Ms. Post, Ms. Kuhn and Mr. Ekstrom. Ms. Post was especially resistant to billing Crown Castle for its utility costs. She delayed and refused to acknowledge Crown Castle's contractual obligation under its agreement with the University.

89. Similarly, Ms. Kuhn first denied that the University's contracts entitled the University to reimbursement of past and future utility expenses. After Ms. Davis double checked the contracts, Ms. Kuhn discouraged Ms. Davis from recovering the funds for the University because it would not ultimately go to UIT. After the past payments were recovered (Exhibit 58), Ms. Kuhn only grudgingly acknowledged the result and then held one of the payments (the Sprint payment of about $24,000.00 (Exhibit 60) that went initially into UIT accounts) and delayed releasing those funds to the Facilities

Department. Ms. Kuhn and the others were not only upset with Ms. Davis and Mr. Wilson, they were also embarrassed by the exposure of their longstanding failure to recover these utility costs for the Facilities Department.

90. The IA contains other errors as to this issue, but it is correct when it states that Ms. Kuhn "was very clear with Jasmin [Davis] that UIT did not pay for power, power is paid by Facilities, and if UIT is reimbursed for power, it belongs to Facilities." Whether the reimbursements belong to the Facilities Department has never been in dispute, but Ms. Davis's and Mr. Wilson's responsibilities to save the University money, however, were not limited to what they could save UIT. As University employees, their duty was to prevent the waste and misuse of public resources regardless of which University department benefited.

## UNNECESSARY DAS EXPENDITURES

91. Before Ms. Davis, who provided the strategic planning, and Mr. Wilson, who provided technical expertise, undertook their responsibilities for cellular coverage planning at the University in March and July of 2014, respectively, UIT, under the direction of Ms. Post, had contracted, at a cost in excess of $628,000.00 (Exhibit 61), for the installation of Distributed Antea Systems ("DAS") in five buildings located across the campus (Sorensen USTAR, Honors Housing, Skaggs Pharmacy, Kennecott Phase 1 and Sorensen Arts (the "Phase 1 Buildings")).

92. When Ms. Davis and then Mr. Wilson took over the cellular planning responsibility, an additional five buildings were being built (Kennecott Phase 2, the Dental School, Mid-Valley Health Center, Student Life and the Law School ("the "Phase 2 Buildings")) for which Ms. Post had planned DAS installation at a cost in excess of $715,000.00. (Exhibit 61).

93.     These Phase 1 and Phase 2 Buildings were funded primarily by solicited donations from charitable foundations, and generous donors giving back to the University, including the following philanthropists:

| Building Name | Donation | Donor(s) |
|---|---|---|
| Dental Building | $30m | Ray and Tye Noorda (late Founders of Novell) |
| Law Building | $62.5m | SJ and Jesse E. Quinney Foundation, major sponsor + LDS church + numerous other donors, $2.2m Rita Fordham |
| Skaggs Pharmacy (2013) | $60m | ALSAM Foundation and Sam Skaggs charities |
| Kennecott | $24m | Rio Tinto Kennecott |
| USTAR Sorenson Molecular Biotechnology Building (2012) | $100m | Utah Science, Technology And Research Initiative + $15m from Sorenson Legacy Foundation, $1.25m Micron Technology Foundation |
| Student Life | $3m | George and Delores Eccles Foundation grant, $1m U credit union, $1m Kem and Carolyn Gardner |

As set forth below, Ms. Davis and Mr. Wilson became concerned that not only was UIT wasting some of the donated money the University had received to fund an unnecessary DAS system, but that the donors would be less inclined to make further gifts to the University in the future if their past donations had been partially wasted.

94.     Based on the proximity between the Phase 2 buildings and the existing cellular towers, a review of DAS documents for the Phase I Buildings, and an inspection of physical DAS hookups in the Phase 1 Buildings, Ms. Davis and Mr. Wilson made an initial determination in July 2014 that, with the exception of the Student Life building, DAS expenditures on the Phase 2 Buildings were likely unnecessary.

95.     The physical inspections revealed that most of the Phase 1 Buildings had never had their DAS physically connected to any of the five carriers, despite the $628,000.00 DAS investment in the Phase 1 Buildings.  Of the five carriers, only one, T-Mobile, was connected to three of the buildings. None of the other carriers were connected to any of the Phase 1 Buildings.

96.     The Phase 2 Student Life Building which had not even been budgeted for DAS was not included in the $715,000 cost.  That building was provided with a different cellular coverage solution in the master plan eventually developed by Ms. Davis and Mr. Wilson, which was supported and approved by the cellular carriers.  Thus, it appeared to them that the further DAS expenditure, like the previous DAS expenditure, was probably unneeded.

97.     On Monday, July 21, 2014 (Exhibit 62), after Ms. Davis had received a request from the University Facilities Department about DAS installation in the Phase 2 Buildings, she and Mr. Wilson communicated to the Project Manager in the Facilities Department their initial conclusion that DAS installation may be unnecessary and that the cost of the system could likely be avoided.

98.     On Friday August 1, 2014, the Facilities Project Manager, Clint Bunnell, emailed (Exhibit 62) Ms. Davis indicating that the "user group" or planned occupant of the Mid-Valley Health Center building wanted to try to avoid the DAS costs:

> The user group welcomes the idea of saving the costs associated with not installing the DAS.  While sitting in our meeting [in the nearly completed Mid-Valley Health Center] everyone checked their phones and depending on service provider and plan there were 2 – 5 bars across the board.  The contractor confirmed he had never had an issue, not even in the mechanical room.  The request was made that we get something in writing identifying that there would not be an issue in the future.  Until we get the building enclosed with masonry and metal panels they may not be satisfied.  Is there any other way of testing or something you could give us in writing indicating there won't be major issues.

99.     On Monday, August 4, 2014, Ms. Davis responded (Exhibit 62):

I discussed this at length with Barry today to explore whether there are any options that we can propose that would give you the level of certainty that you are looking for. We concluded that our best recommendation is to hold on the budget you have allocated for DAS for now, and let's re-visit the discussion once the Fire Marshall has provided his report on the public safety network. . . .

The good news is the proximity of this building to the mall means you probably will have good coverage year round because the carriers will continually to build and adjust the network to fit the needs of their mall customers. So you will benefit by default. You are in such a great location, we are less worried about this building than we are about the other buildings on campus, which aren't surrounded by cellphone towers. As you probably know, it's hard to get the carriers to invest at the U. They build their networks to serve the largest population centers and in their analysis, malls are much more attractive to them than university campuses.

I hope this gives you enough information for now. I would like to set up another meeting with you to visit the dentistry building and review any other buildings that you are managing so that we can get engaged early since each building is unique. Please could you let me know what dates/times would work for you next week and I will get that set up.

100.    UIT had done an RFP for the Phase 2 Building DAS expenditure, but Ms. Davis and Mr. Wilson were required by their understanding of the governing policies (Exhibit 15) that they had to notify UIT leadership that the projected $715,000.00 expenditure was likely not necessary, and they did so as respectfully as they could.

101.    This effort by Ms. Davis and Mr. Wilson to save $715,000, however, did not please Ms. Post, her team, and other members of UIT management because DAS had been promoted (Exhibit 63) by UIT to the various campus departments, which would be housed in the Phase 2 Buildings, as a needed service that would be provided by UIT. Acknowledging that DAS was not needed in the Phase 2 Buildings would have risked harm to Ms. Post's special relationship (Exhibit 65) with the proposed DAS installation vendor Interface, and caused embarrassment for promoting an unnecessary system. In addition, UIT, and particularly Ms. Post and Mr. Corbato, stood to benefit from the DAS installation

because installing DAS kept them, and her, busily employed and supported their budget requests from the University.

102.    By September 22, 2014, when Ms. Post apologized (Exhibit 64) for her lack of congeniality over this issue, things were coming to a head.  Ms. Davis and Mr. Wilson had discovered a number of waste and abuse problems and were developing proposed solutions to save the University money, but UIT leadership was resistant and had started to act hostilely (Exhibit 66) and in retaliation (Exhibit 67) against them.  Because little progress with Mr. Ekstrom and Ms. Post was being made, Ms. Davis and Mr. Wilson had to follow University policy by taking their concerns to the next level of management, in accordance with Ethical Standards and Code of Conduct, Ethics and Compliance Reporting guidelines (Exhibit 15), which was Mr. Ekstrom's and Ms. Post's supervisor, Mr. Corbato, the Interim CIO.

103.    On September 22 and October 10, 2014, Ms. Davis emailed (Exhibit 68) Mr. Corbato inviting him to lunch to discuss her and Mr. Wilson's discoveries and their plan to address concerns related to waste and abuse.  Mr. Wilson sent three similar emails to Mr. Corbato on September 22, 2014, requesting a lunch meeting to discuss the waste and abuse.  Mr. Corbato never responded to Ms. Davis's or Mr. Wilson's emails.

104.    As a backup and for budgetary purposes only, Ms. Davis and Mr. Wilson undertook to obtain competitive bids from potential DAS installation vendors for Phase 2 Buildings as required by University purchasing policy (Exhibit 54) and Utah law (Exhibit 69).  Those requirements mandated competitive bids.  Requests for proposal soliciting competitive bids were sent by Ms. Davis and Mr. Wilson with the support of the University Purchasing Department to four potential vendors, Americom, Interface, Wasatch Electric and Goodman Networks.  The requests for competitive pricing were made by Ms. Davis and Mr. Wilson in compliance with University and State purchasing requirements, even

though Ms. Davis and Mr. Wilson were informed that Ms. Post had already promised the work to her preferred vendor, Interface.

105.    In response to Ms. Davis's and Mr. Wilson's efforts to comply with purchasing requirements, Ms. Post and her team supported by Mr. Ekstrom and Mr. Corbato, became increasingly aggravated with them as each of the respective Phase 2 Buildings neared completion.  As these buildings were being completed, Ms. Davis and Mr. Wilson showed that four of them did not need DAS.  The backup budgeting quotes further threatened to eliminate Ms. Post's favored vendor (Exhibit 65), Interface, because there had been no successful bid from Interface showing that it was the lowest bidder on the last four Phase 2 Buildings.  Moreover, Interface had participated in the planning of the DAS technical "solution" and was, therefore, should have been ineligible (Exhibit 42) to submit bids.

106.    During this time, Ms. Davis and Mr. Wilson learned that Interface had subcontracted with Americom to install DAS in the Phase 1 Buildings. The University would have saved money if they had contracted directly with Americom, rather than Interface, a Denver-based company, who at the time had no staff in Utah.  This discovery added to Ms. Davis's and Mr. Wilson's belief that UIT's work to put DAS in the Phase 2 Buildings would again waste resources because Interface would likely have to subcontract with Americom to do the work.

107.    Accordingly, members of UIT management increasingly resisted Ms. Davis and Mr. Wilson's efforts to save the DAS cost on the Phase 2 Buildings (and comply with purchasing requirements), but as Ms. Davis and Mr. Wilson continued to build a master plan for cell coverage, they were able to finally confirm (Exhibit 70) that adequate indoor coverage was already available in the Phase 2 Buildings (for which DAS had been budgeted) and that the DAS expenditure could be eliminated.

108.    Before Mr. Wilson's employment was terminated on December 15, 2014 (Exhibit 26) he and/or Ms. Davis physically tested three of the Phase 2 Buildings at various stages of construction (the Kennecott Phase 2 project was not near completion), always confirming that the DAS expenditure was not needed and would be a waste of resources.  After Mr. Wilson's termination, Ms. Davis continued trying to avoid the unnecessary DAS cost by conducting a final test of the Mid-Valley Health Center Building.  Ms. Davis wrote a follow up email (Exhibit 71) dated February 17, 2015 to various people, including UIT managers:

> I was at Mid-Valley Clinic this morning, introducing the cellular consultant to Sylvia.  The 3 of us tested on all 5 floors and were able to make phone calls and send text messages between AT&T and Verizon on all 5 floors.  We even tested from within exam rooms.

109.    While Ms. Davis was working to eliminate the cost of the unneeded DAS, Ms. Post's team was telling (Exhibit 72) the Facilities Department that Ms. Davis and Mr. Wilson had dropped the ball on Mid-Valley, one of the Phase 2 buildings, and Ms. Post's account executive, Lisa Osborne, was causing a panic by telling (Exhibit 73) UIT leadership that building's user group had reported that Mid-Valley could not open until DAS was installed.  Unfortunately for Ms. Post, there were emails (Exhibit 74) between Ms. Davis and Mr. Wilson, the Facilities Department and others that showed Ms. Post's claims were not accurate.  Ms. Post was embarrassed by this and upset with Ms. Davis.  In addition, user groups or customers, such as the University Hospital, were frustrated with the situation.  On March 4, 2015, Jim Livingston, CIO of the University Hospital, expressed his concerns in an email (Exhibit 75) to Ms. Davis and Steve Hess:

> I like the benefits of having Mid-Valley be a Macro site, but how do we move from having Verizon be interested to having them be committed?  Coming up with the right solution has been very frustrating for all of us, but it seems like there are varying opinions on how we should move forward.  I feel like putting in DAS has some big unknowns and may not get us to the finish line.  I was hoping for a top notch consultant [Wilson's replacement] that could give us solid direction, but it seems the consultant may not be the expert we hoped for.  I recommend getting the team together in the same room

and get everyone on the same page for starters. There have been two camps throughout this process and I have to say it is frustrating for the customer (Brent Price, Karen Newman, myself, etc.) to see how this process has worked, or better said, not worked. Now the customer is put in a position to try and make a decision on how to proceed with multiple recommendations on the table. That's not a fair position to put the customer in. I feel like if UIT is going to be in the business of providing these services then they should bring better expertise to the table. Sorry if that's harsh, but this has not been a fun process. I'll look forward to Steve's comments and direction because I don't know enough about DAS and Macro sites to make a recommendation.

110.     Rather than further risk offending Ms. Post and other UIT managers, in late March 2015, Ms. Davis offered to turn the responsibility of indoor DAS ("iDAS") back to Ms. Post, which offer was accepted by Mr. Hess. Ms. Davis retained the responsibility for outdoor DAS, including the macro cellular network or master plan (which remains confidential at the carriers' requests) to provide the cellular signal to the campus including Phase 2 Buildings. As a result, Ms. Davis did not test the last Phase 2 project, a 5,000 square foot addition to the Kennecott Phase 1 building, in which a DAS system had been installed under the prior management of Ms. Post. The Interface invoice (Exhibit 76) confirms, Ms. Post later had DAS installed in the Kennecott Phase 2 building by Interface, her preferred vendor (Exhibit 77), after she resumed responsibility for iDAS because Ms. Davis was no longer in a position to stop the wasteful spend (Exhibit 78), or ensure purchasing processes were followed, or advise the customer that the system was unneeded.

111.     Not only was there adequate macro cellular coverage in, at least, the tested Phase 2 Buildings, Ms. Davis and Mr. Wilson had received correspondence from various cellular carriers confirming that they had not provided cellular signal to all DAS installation in the Phase 1 Buildings. Examples of the correspondence Ms. Davis received; include the following emails from AT&T and Verizon, which service about 80% of the cellular users on campus:

**AT&T to Ms. Davis on June 5, 2015 (Exhibit 79):**

I have polled our local team of engineers in Utah and we are not attached to any of the DAS in the [Phase I Buildings] buildings listed below. I don't know the reason but I would say it is likely a combination of economics and in some cases the DAS is from a vendor that doesn't meet AT&T's standards.

Costs to attach a BTS to an existing DAS depends on how many sectors, type of technology supported (AWS, UMTS, LTE, etc.) and how many carriers or channels the DAS supports in each of those frequency ranges. A good ballpark figure to use is $250K - $500K, assuming adequate head end space, power and fiber are available.

**Verizon to Ms. Davis on June 26, 2015 (Exhibit 80):**

We are not connected to any DAS on your [Phase I Buildings] list below:

| Phase 1 Buildings | Facilities Building Number |
|---|---|
| Sorenson Ustar | 151 |
| Honors Housing | 112 |
| Skaggs Pharmacy | 582 |
| Kennecott Phase 1 | 372 |
| Sorenson Arts | 71 |

112.    Correspondence from Verizon further confirmed that it had opted out of providing any cellular signal to the Mid-Valley Phase 2 building and confirmed that if the University proceeded to install DAS at its own cost, the University would need to obtain Verizon's permission to rebroadcast Verizon's licensed signal, as is required by law:

**Verizon to Verizon forwarded to Davis on March 26, 2015 (Exhibit 81):**

I'm glad they are thinking about installing their own DAS; however, they cannot repeat our signal without our permission. When a building owner wants to buy their own repeaters we do a pretty simple agreement that gives them permission to re-broadcast our frequencies. The frequencies are licensed to VZW and we need to provide them with some technical data in order for the repeaters to work efficiently. Chad will be a good resource for you on this and Connie can send over a template of the rebroadcast agreement if you'd like.

If they build the DAS (which would be the quickest route), we can likely get a business case to pass for VZW to install and maintain repeaters to feed the DAS but they can go the customer owned route on the repeaters as well. . . ."

113.    The only carrier that provided cellular 3G signal to any Phase I Buildings was a minor carrier, T-Mobile, which later provided its signal to three of the five Phase I Buildings.

114.    Under the master plan that Ms. Davis developed with Mr. Wilson's assistance, 11 permanent LTE 4G macro sites (Exhibit 82) would have been installed at the carriers' expense, similar to a temporary 4G LTE macro site that they had installed at the Stadium, which would have resulted in projected revenues to the University of $3,900,000.00 (Exhibit 82) over 10 years.

115.    This master plan also had the support of every department across campus that had voiced concerns about coverage to Ms. Davis and Mr. Wilson, including Huntsman Hospital, Stadium, Development Office, Red Butte Gardens, Chief of Police, School of Medicine, Lassonde Institute, Facilities, Primary Children's Hospital and the University Hospital.  For example, at the request of Mr. Ekstrom, Ms. Davis and Mr. Wilson presented their master plan at the Infrastructure (Exhibit 83) Portfolio meeting (Exhibit 84) in August 2014, a monthly meeting hosted by Mr. Ekstrom, and attended by key stakeholders from across campus.  At this meeting, Cynthia Furst, Associate Vice President for Research, voiced support for the master plan and further directed Mr. Wilson and Ms. Davis to "get as much revenue as you can from the carriers".  When Ms. Post signed the Crown Castle Addendum that is referenced beginning at paragraph 112, she undermined, or at least delayed, the University's ability to realize the projected revenues from the master plan.

116.    Long before turning the iDAS responsibility back to Ms. Post, Ms. Davis was being blamed by Ms. Post, her team, and UIT leaders for "dropping the ball" by not ordering the un-needed Phase 2 Buildings' DAS equipment.  Despite turning over the iDAS to Ms. Post, Ms. Post and her team continued to interfere with Ms. Davis's efforts to move forward with the master plan and Ms. Davis was increasingly marginalized and isolated by UIT leadership.

117.    Before turning the iDAS responsibility back to Ms. Post, Ms. Davis had escalated her concerns about the waste and misuse of University, Utah and donor funds and Ms. Post's Code of Conduct violations and Mr. Corbato's code of conduct violations in a dozen or so emails (Exhibit 85) to Ms. Kuhn, Mr. Hess and other UIT managers.  For example, in a meeting on Friday, February 13, 2015 and in subsequent meetings with Mr. Hess, Ms. Kuhn and Ms. Post, Ms. Davis had raised all of the concerns with iDAS Phase 1 Buildings, Phase 2 Buildings, Interface and Crown Castle Addendum and Steve Hess confirmed (Exhibit 86) the cellular master plan was a much better plan (a "no-brainer") given how much income it would generate.  Despite Ms. Davis's emails, neither Mr. Hess nor Ms. Kuhn protected Ms. Davis or supported the master plan.

118.    Ms. Davis's effort to split the short term 3G iDAS role from the long term LTE 4G cellular master plan divided the responsibilities clearly between Ms. Post and Ms. Davis respectively and was intended by Ms. Davis to lead to more harmony in UIT.  This harmony, unfortunately, was not realized because Ms. Post continued to interfere, disrupt, and de-rail Ms. Davis's role and the master plan, as evidenced by the Crown Castle Amendment (Exhibit 87) that Ms. Post signed, violating University and Utah policies (Exhibit 88) and procedures, as described in herein.

119.    Ms. Post continued to have discussions with Verizon about an indoor DAS system at Mid-Valley, further delaying the master plan.  Ms. Post also responded to a legal letter (Exhibit 89) from Crown Castle that impacted the master plan, without consulting with Ms. Davis, Mr. Hess or the Office of General Counsel.

120.    In addition, after the Crown Castle Agreement was signed in 2006, Crown Castle committed to provide certain improved coverage, including better coverage for 911 positioning for emergencies, but it failed to provide that coverage, and as a result, accurate 911 positioning is

unavailable to parts of the University campus preventing first responders from identifying the location of University students or personnel in the event of an emergency such as an active shooter on campus.

121.    The University terminated the exclusive portion of the AT&T part of the Crown Castle Agreement, primarily for two reasons:  First, the carriers with which the University intended to work directly had offered to lease space for their equipment from the University, thus increasing University revenues.  Second, the carriers offered to provide and update the equipment to 4G LTE necessary to improve coverage along with positioning, working directly with the University at no cost to the University. The backdated First Amendment to the Crown Castle Agreement signed by Ms. Post prevented accomplishment of these two objectives because it required AT&T to pay the middleman costs of Crown Castle which AT&T had declined to do.  Also, it did not utilize the needed 4G LTE locations across campus.  Per AT&T, the original Crown Castle locations were insufficient.

122.    Accordingly, the First Amendment caused the continued waste or misuse of public funds, property or manpower because AT&T would have, in addition to providing the site improvements at no cost, paid the University market rates plus annual increments contributing to the projected revenues for the University of at least $3,960,000 (Exhibit 82) over 10 years compared to the below market rate of $390,000 paid over 10 years to the University by Crown Castle as well as the utilization of University fiber for free.  Moreover, Crown Castle is unable to solve the ongoing coverage and 911 call positioning problems itself.

123.    Before the First Amendment was signed by Ms. Post, Ms. Davis raised these concerns to Ms. Post, Mr. Ekstrom, Mr. Corbato, Mr. Nixon, Ms. Kuhn, Mr. Denna and Mr. Hess, because Ms. Davis wanted to prevent the continued waste and misuse of public funds and because she was concerned about the coverage and 911 positioning problems.  Previously, Mr. Wilson had raised the same concerns for the same reasons to Ms. Post, Mr. Corbato, Lisa Kuhn and Mr. Ekstrom.  Ms. Davis and Mr. Wilson

also made these individuals aware that other institutions of higher learning in Utah, Colorado and Texas had experienced (or wisely avoided) similar problems with Crown Castle or other exclusive vendors.

124.     Despite bringing these concerns to Ms. Post's and the others' attention, Ms. Post, who is not a University Officer, signed the First Amendment without authority and without the knowledge of Ms. Davis, Mr. Hess or General Counsel for the University, extending the terms and scope of the Crown Castle Agreement, committing the University for many additional years.

125.     Many University policies prevented Ms. Post from signing the First Amendment.  An example of the policies violated is Policy 3-004 (Exhibit 88): Processing and Signing Official Documents, which required that the First Amendment be first reviewed by General Counsel for the University and then executed, if appropriate, by a University Officer.   The original Crown Castle Agreement (Exhibit 90) was signed by the appropriate University Officer and the First Amendment thereto, extending the agreement for many years, should have been signed by the appropriate University Officer, if at all, never by Ms. Post.

126.     Not only had Ms. Post signed the First Amendment (Exhibit 87) without authority on April 10, 2015, the Amendment she signed had been prepared by Crown Castle (Exhibit 91) with an effective date of March 14, 2014.  That date is significant because on March 31, 2014, Ms. Davis with approval of the University had notified (Exhibit 92) Crown Castle that AT&T was no longer subject to the 2006 Crown Castle Agreement and would be working directly with the University.  However, with the First Amendment belatedly dated thirteen months earlier, Ms. Davis's 31 March 2014 letter (Exhibit 92) was preempted and AT&T's ability to work directly with the University and the University's ability to negotiate with AT&T.

127.     When Ms. Davis learned that the First Amendment had been signed, she reported this via an email (Exhibit 93) to Mr. Hess to inform him of the wasteful and unauthorized Amendment.   She

then called the General Counsel's Office and confirmed that there had been no legal review of the Amendment. Much to the embarrassment and resentment of Ms. Post, Ms. Davis was able, with the support of the General Counsel's Office, to get Ms. Post to retract (Exhibit 94) her signature to the First Amendment and prevented the ongoing waste and misuse of public funds.

128.     UIT leadership listened to the concerns of Ms. Davis and Mr. Wilson, but they were responsible for the waste that had occurred under the original Crown Castle Agreement and did not want the termination of that agreement to reveal the past waste, nor did they want to lose control or diminish the need for their departments, their budgets or their subordinates all of which are justified or locked-in, in part, by such mechanisms of waste as the Crown Castle Agreement.

129.     This issue is generally referenced as Concerns # 9 and # 10 in the Internal Audit of IA report. As stated under Concern # 9 (Exhibit 95) in the IA, Ms. Davis is attributed with saying there are: "[no] procedures for who should sign contracts for the University at UIT." There were no such procedures, nor should there have been. The problem was a lack of training and enforcement. Ms. Davis's concern was that UIT leadership did not follow University policies with regard to the review and execution of the Crown Castle Amendment. After this issue came to a head, Mr. Hess claimed that he had announced in a leadership meeting that all such contracts should be sent to him in the future for his signature.

130.     Although the IA (Exhibit 95) report concluded that Ms. Davis's concern was "without merit," its conclusions distort the true facts. The IA's "Audit Findings" substantiated her concern: "Per UIT management, it is generally understood within UIT that UIT Directors may approve service orders." As noted above, however, the contract amendment Ms. Post signed was not a "service order," as suggested by the IA. The IA Findings then go on to acknowledge, "all contracts must be reviewed and approved by the CIO and the Office of General counsel consistent with University of Utah Policy 3-004

(Exhibit 88). This is exactly the concern Ms. Davis raised: Ms. Post had no authority to approve or sign the Crown Castle Amendment.

131.    UIT has no written procedures for reviewing, approving and signing contracts, nor may it.  UIT must follow University policies for contractual review, approval and signing.  Policy 3-004 (Exhibit 88) Processes and Signing Official Documents, states: "Official documents with significant legal implications should be forwarded to the University Office of General Counsel for review before execution by the appropriate University Officer."  The policy defines Official Documents as:

> [a] written agreement, proposal, or other formal instrument regarding a course of action, the expenditure of University funds, or other contractual obligation - which is intended to be binding upon the University. Official Documents obligate the University as a whole, or its divisions, to act, engage, consent, perform, or pay. Typically, at least one party to the transaction is external to the University. Official Documents may be in the form of contracts, proposals, agreements, statements, notices, resolutions, letters, memorandums, licenses, indentures, etc. But such documents may go by other names as well.

Here, the University's policies were not followed.  Ms. Post signed the First Amendment, which was an "Official Document," without authority or legal review.

132.    In response to Concern # 9 (Exhibit 95), the IA adopted UIT's claim that "it is generally understood within UIT that UIT Directors may approve service orders. . . ."  Again, Ms. Davis never raised any concern about "service orders."  Service orders (also called network orders) may be signed by Mr. Hess or his designee.  IA and UIT incorrectly described the First Amendment as a "service order" to create a straw issue and to deflect focus from the fact that Ms. Davis's concern was about an amendment to the Crown Castle Agreement.  The "First Amendment" was not a mere service or network order, which are documents that fulfill contracts.  The backdated First Amendment changed the actual terms of the contract; it did not merely fulfill the contract.

133.    The IA split Ms. Davis's and Mr. Wilson's remaining concerns about the unnecessary DAS expenditures into six separate concerns.  For example, Concern # 14 (Exhibit 96) was stated in the

IA as follows: "DAS wireless systems are placed in buildings but not connected to wireless carriers and therefore do nothing. DAS systems are not supported by wireless carriers." This concern stems from the ineffectiveness of DAS in the Phase 1 Buildings and whether similar expenditures for DAS in the Phase 2 Buildings would be a waste of money. More accurately stated, Ms. Davis's and Mr. Wilson's concern was that although UIT had installed DAS in the five Phase 1 Buildings, none of these buildings had source signal from any of the carriers.

134.     Two to three years later, T-Mobile did connect to three of the Phase 1 Buildings via the head and equipment in building 822's datacenter, but as confirmed by emails (Exhibits 79) and discussions (Exhibit 80) with the carriers, AT&T, Verizon and Sprint never connected to DAS in any of the Phase 1 Buildings. Thus, as of the dates of Ms. Davis's and Mr. Wilson's terminations, these buildings had no AT&T, Verizon or Sprint approved source signal of any kind. To the extent there was no carrier-connected-DAS source signal, DAS could not improve indoor coverage in these buildings, and, therefore was a waste and misuse public resources.

135.     On information and belief, most of the DAS equipment in the Phase 1 Buildings is trying to steal carrier signal from antenna installed on the top of other buildings. This is acknowledged in the IA, for example in UIT's response to Concern # 14, which states ". . . DAS systems may be connected directly to the carriers (as described in UIT's response to Concern # 15) *or through the nearest cell tower*." Emphasis added. DAS equipment is trying to take signal from cell sites on buildings because Interface, the vender that installed DAS in the Phase 1 Buildings, did not assume contractual responsibility (Exhibit 97) to provide carrier source signal to the Phase 1 Buildings.

136.     Moreover, the IA does not address the Federal Communications Commission requirement (Exhibit 98) that permission must be obtained from a carrier before a system like DAS may be used to boost or rebroadcast a signal licensed to a carrier. The FCC requirement was in place when

the Phase 1 Buildings were built and remains in place. No such FCC-required permission has been obtained by UIT from any of the carriers, with the exception of T-Mobile, which granted UIT permission to use its licensed signal in three of the five Phase 1 Buildings.

137. UIT's Response to Concern # 14 includes the statement: "DAS systems contracted through UIT are functioning as intended." This is not accurate because the only carrier connected to DAS in the Phase 1 Buildings is T-Mobile and T-Mobile is connected to only three of the buildings. UIT's Response to Concern # 14 also states that "UIT follows carrier best practices," but regardless of any so called "best practices," UIT is required to have written permission from the carriers and UIT only has carrier permission from T-Mobile for three buildings. Therefore, contrary to the IA's Conclusion (as to Concern # 14) that those carriers "routinely grant approval for those systems to use the cell towers," Ms. Davis's and Mr. Wilson's efforts to confirm UIT's FCC-required approval from the carriers confirmed that no approval had been granted with the limited exception of T-Mobile.

138. Concern # 15 (Exhibit 99) states: "DAS systems are installed and mandatory for all new construction to generate profit for UIT." The first part of Concern # 15 misstates the concerns raised by Ms. Davis and Mr. Wilson. First, they recognized that a building by building analysis was needed to determine whether DAS was necessary. Second, their actual complaint was that UIT was representing that DAS was necessary in all of the Phase 2 Buildings, despite the results of their analysis. Third, they were concerned that UIT was representing that DAS would provide indoor coverage with four carriers and 911connectivity when the carriers had indicated they had no interest in connecting to the Phase 2 Buildings.

139. The second part of Concern # 15 related to "generating a profit for UIT," however, is correct. UIT does benefit from DAS installations (at the expense of other University Departments) via its use of the UIT Fiber Team which it bills at $45.00 an hour, rather than Americom, the state contract

awardee, which bills at $37.00 an hour. UIT also charged other University Departments a 15% markup on all supplied equipment that passed through UIT's warehouse. It was true that the cost of UIT service coordinators was merely passed through to the University Departments, but all of this is related to the unnecessary expenditures for DAS and simply protects and expands UIT's turf for annual budgeting purposes. The more UIT could support its need to provide services to the campus, the more it generated income for UIT through the Fiber Team, warehoused equipment and man-hours.

140. The IA's Conclusion to Concern # 15 is that "[t]he stated concern is incorrect." But it was the way Ms. Davis's and Mr. Wilson's concern was restated in the IA as Concern # 15 that was incorrect, except for the part about generating profit for UIT. Regardless, they reported in good faith the misuse of public funds and suspected violations of law related to UIT's efforts to protect and expand its turf at the University at the expense of other University Departments.

141. Concern # 16 (Exhibit 100) states: "DAS systems installed are connected to the nearest carrier cell tower making 911 location difficult and cell boosting strength low." The IA does not state this concern strongly enough. Mr. Wilson and Ms. Davis's concern was that the expensive DAS equipment was typically not hooked up to the carriers' signal. Thus, UIT was knowingly allowing emergency responses to be negatively impacted. By stealing signal from an antenna located on one building to try to boost the signal of another building (in which DAS was located, but not hooked up to the carrier's signal) the origin of 911 calls was (and is) thrown off causing emergency responders to respond to the building with the antenna, not to the building from where the 911 call was made. UIT's response to this concern and the IA's findings tried to minimize the seriousness of this concern, but ultimately the IA had to conclude that "[t]he stated concern about 911 calls is correct."

142. Concern # 17 (Exhibit 101), which also relates to DAS, states: "Interface (DAS installation company) made one bid many years ago to install DAS in one building. They have been

installing DAS for the University ever since without a contract or formal bid per building." This concern is generally stated correctly, although the scope of the RPS was for two buildings, not one. UIT did issue an RFP for DAS in 2012, but the scope of this RFP was for two buildings only and the Interface proposal was for two buildings only. UIT then continued to use Interface for multiple other DAS installations without first obtaining competitive bids or issuing a new RFP via Bidsync. This practice violates the controlling purchasing policies (Exhibit 54). Notwithstanding the attempted justifications for this pattern of policy violation in the IA, the IA's conclusion acknowledges the appropriateness of Ms. Davis's and Mr. Wilson's concern: "Conclusion: The stated concern identifies one instance where lawful procurement practices were followed, but more clarity could have been provided. Purchasing Department management indicates that they have given additional instruction to Purchasing staff regarding what is required to extend bids for future projects. ***UIT management has indicated that a new bid will be required for future DAS projects***. (Emphasis added).

143. Concern # 18 (Exhibit 102), states: "Interface (DAS Installation Company) does not provide detailed invoices for services rendered and Barry believes that they are overcharging the University for DAS installation. UIT blindly pays the invoices." This concern relates to Mr. Wilson's efforts, later joined by Ms. Davis, to get UIT management's support for Mr. Wilson's requests that Interface provide more detailed invoices so receipt of the deliverables and completion of the work could be verified before payment. The IA's Conclusion (Exhibit 102) was: "Payments to Interface are supported by detailed proposals. While invoices lack detail, they are consistent with the proposals." This, however, misses the point of the concern. Interfaces' invoices certainly lacked detail, but whether the invoices were actually "consistent" with the proposals may or may not be true. Regardless of whether the bill is "consistent" with proposed cost, some level of due diligence is necessary to confirm whether the materials and services listed in the proposal were actually provided. This due diligence is

necessary for many reasons, including to confirm that invoices are in fact consistent with agreed-to proposals, before invoices are paid to ensure that waste and misuse of public funds, property or manpower is avoided.

144. Concern # 19 (Exhibit 103), states: "Fabricated complaints of lack of cell service in Mid-Valley Clinic building were made by Caprice Post and Lisa Osbourne to try to get DAS installed in a building that did not need it and to obtain funds for UIT for the installation plus UIT's markup for installation." More accurately stated: Ms. Davis was told by Ms. Kuhn, Ms. Osborne, Mr. Ekstrom and Ms. Post that the "VP of Health Sciences" had complained about UIT's inability to provide cell service at the Mid-Valley Clinic building as part of UIT's effort to have unnecessary DAS equipment installed in the building. Ms. Davis with Sylvia Jessen and Rod Perry (who replaced Mr. Wilson) had tested each floor of the Mid Valley Clinic building and found adequate (Exhibit 71) cell coverage. Accordingly, when Ms. Davis was told that the VP of Health Sciences had allegedly complained, she attempted to learn the identity of the VP of Health Sciences so she could make contact to understand the concern. No such person was ever identified for her in response to her emails (Exhibit 73) and no VP of Health Sciences is identified in the IA as part of Concern # 19 (Exhibit 103).

**DOWN TOWN DATA CENTER MONEY PIT**

145. Before Ms. Davis and Mr. Wilson were employed by the University, Mr. Corbato was Deputy Chief Information Officer of UIT and Interim Director of the Center for High Performance Computing ("CHPC") at the University. In those capacities, he and other UIT leaders were largely responsible for the purchase and renovation of the old Coca-Cola bottling building at 875 South and West Temple in Salt Lake City for its use as a Downtown Data Center ("DDC") for the University. A press release (Exhibit 104) dating to approximately January 2012 touts Mr. Corbato's DDC project.

146.     In 2006, Hewlett-Packard Company ("HP") published an article (Exhibit 105) in which Jim Livingston, the Data Resource Center Director at the University of Utah Health Sciences Center ("UUHSC") is quoted.  The article reports that HP

> brought in partner Avnet to conduct an analysis of UUHSC's server infrastructure, whose findings validated the potential of UUHSC's [server] consolidating goals verses a new [physical] data center."  The article continues: "In 2005, UUHSC management realized that in order to keep pace with the explosive growth they were facing, they would either need to quickly build a new [physical] data center or find a way to consolidate hundreds of servers. The existing data center was so stressed that it had run out of space, power, and cooling capacity.  According to . . . [Mr.] Livingston, 'If we plugged in one more thing in the data center, we would have caused serious problems.'"

> HP proposed a 4:1 consolidation ratio, u**sing software to virtualize the server environment**, thus allowing staff to run multiple virtual servers on a single physical box in order "to allocate resources — processors and memory — as needed to optimize performance without wasting resources.  (Emphasis added).

The article reports that, rather than realizing a 4:1 consolidation ratio, a 10:1 consolidation ration was actually accomplished using software instead of bricks and mortar.   After the 2006 article was published, HP published a follow up article (Exhibit 106) in 2007 noting that UUHSC had by then achieved a 15:1 ratio using software.

147.     The same or better options to "optimize performance without wasting resources" on brick and mortar data centers was available to UIT in 2008.  For example, UIT could have used cloud storage options, such as the Microsoft product Azure, or Amazon's cloud storage service AWS, or rented space in existing commercial data centers (Exhibit 107), such as C7 or ViaWest, instead of expanding beyond its seven existing data centers located on campus.   The University, however, chose to maintain its existing seven data centers and expand into a gigantic, off-campus brick and mortar money pit by purchasing and renovating the old Coca-Cola bottling plant.

148.     UIT purchased (Exhibit 108) the old bottling plant in 2008, and then in 2009, commissioned HP to write a report (Exhibit 109) justifying the purchase and renovation costs.  HP's

report did not address the ongoing operation and maintenance costs of what the DDC would require, nor did it address the less expensive option of cloud storage or renting space in existing commercial data centers.  The 2009 HP report stated:

> The primary objective of the project was to evaluate the current state of the seven existing data centers identified by University of Utah and to provide recommendations for sizing of a data center to accommodate consolidation of these data centers into an existing building located at 875 S. West Temple Street, Salt Lake City.  . . . The seven data centers identified by University of Utah were:
> • Park Building
> • Komas Datacenter
> • Student Services Building
> • Komas Cluster
> • Eccles Broadcast Center
> • Marriott Library
> • Fort Douglas.

149.    Whatever the merit or lack of merit of the initial bottling plant investment, which occurred before either Ms. Davis or Mr. Wilson were employed by UIT, the DDC has not replaced any of the seven existing on-campus data centers or realized the "projected cost savings" associated with not operating those centers.  UIT remains in possession of, and responsible for, these physical data centers and UIT's combined budget for all of its data centers has increased significantly.  And, as to the DDC, HP's 2009 report (Exhibit 109) acknowledges that: "[t]o date none of the outside entities polled [see table below] have expressed any desire to collocate their IT systems in this new data center."

| Potential University Departments | Potential Colleges | Potential entities outside of U of U |
|---|---|---|
| Ucard, bookstore | Law | ARUP labs |
| GIS | Fine Arts | Intermountain Healthcare |
| Development Office | Architecture | State board of regents |
| Project Management Group | Business | Utah State - HPC |
| Facilities Management Group | Behavioral Sciences | Southern Utah - HPC / DR |

| | | Dept of Technical Services |
|---|---|---|
| Campus Design Construction | School of Medicine | |
| Planning | College of Nursing | State Dept of Health |
| Operations | College of Pharmacy | Medical Collaboration |
| Student Systems | College of Health | American Geological Institute |
| Financial Imagining-FORTIS | Mines and Engineering | HHMI |
| | Education | Brain institute |
| | Social Work | USTAR |
| | | EGI Energy and Geophysics |
| | | Scientific Computing Institute |
| | | Huntsman Cancer |
| | | Conflict of Interest |

On information and belief, little has changed since 2009 in terms of colocation by these groups and the DDC remains largely vacant.

150.    Moreover, by the time Ms. Davis was employed in August 2013, the DDC had turned into a potentially embarrassing money pit for the University.  The DDC, which had cost approximately $4,500.000.00 (Exhibit 108) to purchase and had already cost tens of millions of dollars to renovate (including consumption of a $2,600,000.00 (Exhibit 104) grant from CHPC to update the fiber backbone at the University) was only 25% occupied and was losing money every month.  On information and belief, similar losses have continued since Mr. Wilson and Ms. Davis's terminations.  Currently, the University's data centers cost "$2,405,657.00 to operate each year," per the IA report.  Ms. Davis and Mr. Wilson believed that at least 80% of that amount is wasted each year to operate the DDC.

151.    Not only had the DDC become a money pit, its various limitations in terms of technology, data security, safety, fire suppression, lack of geographical remoteness from the University (IA Concern # 33 (Exhibit 133) confirms "UIT management stated that disaster planning is one reason

for a cloud storage solution. From a disaster planning viewpoint, adding additional storage to the Downtown Data Center would not make sense."), as well as the DDC's lack of redundancy for the University and lack of 24-hour staffing and security, may prevent it from ever being adequately utilized. The additional renovation costs of meeting the standards necessary to lease data storage space at the DDC have yet to be born. Nevertheless, UIT has asserted (Exhibit 109) that the cost of the DDC is set off by cost savings realized by consolidating the University's existing, on campus data centers, but that assertion, even if true, does not account for the tens of millions spent to this point to purchase and renovate the Coca-Cola building.

152.    Thus, shortly after becoming employed, Ms. Davis carefully raised the sensitive topic of selling or leasing the DDC to quell/stop the bleed. At the time, she did not yet know of the DDC's technical and other limitations, nor was she yet aware of the complications associated with leasing not-for-profit assets, built with tax dollars, to for-profit entities. Moreover, she also did not then appreciate how politically sensitive, and hazardous to her employment, pointing out how the DDC was wasting University resources would be. Mr. Corbato, Mr. Hess, Mr. Ekstrom, Ms. Post, Ms. Kuhn, Mr. Livingston and other UIT managers did not want to be embarrassed by exposing the DDC's ongoing financial drain on the University, currently reported to be $2,405,657.00 per year (undefined).

153.    Still, unaware of how sensitive this topic was, Ms. Davis simply did her job and followed the direction of the former CIO Eric Denna, who had inherited the DDC problem, to investigate potential options for reducing University expenditures. At first, those options included a sale and/or leases of DDC space, but soon Ms. Davis eliminated the option of leasing space to for-profit entities. The possibility of selling the DDC led to discussions with CenturyLink and a tour of the DDC on September 25 (Exhibit 110) 2014 by Ms. Davis, Mr. Wilson, the DDC manager, and a four-person

CenturyLink team. After the tour, CenturyLink went silent and stopped communicating with Ms. Davis about the DDC and showed no further interest in purchasing it.

154. After the tour, Mr. Ekstrom asked Mr. Wilson about CenturyLink's visit to the DDC. Mr. Wilson commented "looks like runaway spending to me". Mr. Ekstrom responded: "that comment is very offensive to a lot of people who worked hard on it." Mr. Wilson's and Ms. Davis's exploration of a possible sale of the DDC to stop what they believed in good faith was and is a significant and ongoing waste of University resources amounting to at least 80% of the annual $2,405,657.00 cost of running the University's eight data centers greatly embarrassed Mr. Ekstrom and Mr. Corbato, two of the original champions of the DDC' acquisition and subsequent expenditures.

155. As to the DDC, the IA report again reflects no actual audit or an audit with predetermined conclusions. For example, it concludes in reference to Concern # 46 (Exhibit 111) that Ms. Davis's and Mr. Wilson's "statement that the facility is 'losing money' lacks any support." But the IA goes on to state "UIT management believes that the operating costs have been reduced considering staffing and utility costs of all previous facilities compared to the Data Center." On the basis of UIT's statement, the IA then incorrectly concludes that Ms. Davis's and Mr. Wilson's concern about ongoing waste is without merit.

156. The IA also failed to review the full costs of the DDC since its purchase in 2008, including the cost of the HP report (Exhibit 109) commissioned by UIT in 2009 to promote the construction of the DDC, and the millions of dollars spent in renovations, upgrades and maintenance over the last 8 years. The IA in response to Concern # 46 (Exhibit 111), states: "The downtown facility was purchased for approximately $4 million and renovated for use as a data center at a cost of approximately $22 million". Not only do these numbers understate the actual purchase and renovation

costs, but the IA also failed to address why the HP justification report was written a year after the building had already been purchased.

157.     Regardless of the merit or lack of merit of the original decision to buy a shell of a building, and then commission a report a year later to justify the spend, Ms. Davis's and Mr. Wilson's concern was the ongoing costs of the DDC.  The IA failed to address their main concerns: (a) why the University needed a DDC when no other university in the state had one; (b) why none of the original proposed tenants had moved in; (c) why UIT didn't save costs by closing down the other seven physical data centers---as was the original plan to justify the DDC cost, and (d) why UIT continues to purchase cloud storage from Azure and similar vendors when 75% of space at the DDC remains vacant.  This suspected waste of public funds and property was largely confirmed by the IA at Concern # 46 (Exhibit 111): "The building has a significant amount of vacant space and some of the occupied space is used for temporary storage of medical records as they are being scanned."

### IMPROPERLY STEERING A PURCHASE OF AZURE

158.     The State of Utah has selected (Exhibit 69) and established the BidSync system as an online software tool to distribute and receive bids for products and services and to streamline Utah's bidding process statewide.   In turn, the University administers BidSync through the University Purchasing Department and has further adopted University purchasing policies (Exhibit 54) and procedures, which must be followed by UIT employees when considering or making any purchase.

159.     Ms. Davis was concerned that Ms. Kuhn was improperly maneuvering away from the University Purchasing Department's policies, procedures and was manipulating the BidSync system for desired outcomes.  For example, Ms. Davis suspected a violation of purchasing protocols when Ms. Kuhn used BidSync to favor a Microsoft representative by purchasing cloud storage through that representative's vendor.  Ms. Kuhn specifically listed the "Azure" Microsoft product on the BidSync

system and knew, or should have known, that Azure was only available through specific vendors. Other vendors, such as Amazon and Google, have other similar products, as does UIT which maintains an underutilized Downtown Data Center.

160.    As UIT's Director of Finance, Ms. Kuhn should have recognized and accepted Ms. Davis's concern (Exhibit 112) that Ms. Kuhn may be violating (Exhibit 113) the required protocols and favoring Microsoft by cutting corners and risking the waste of University assets (Exhibit 114). Ms. Kuhn showed her frustration with Ms. Davis's push-back on the Azure expenditure by becoming abrupt, agitated and by pressuring Ms. Davis to "go along" and thus violate the policies and procedures. Ms. Davis's efforts to help UIT comply with the required purchasing protocols were rebuffed. This caused Ms. Davis to go to Mr. Hess (Exhibit 115) to express that she was not willing to participate in the purchase as she was entitled to do under the UPPEA. She also notified (Exhibit 116) the University's Internal Auditor (Exhibit 117). This suspected violation of policy may also have been a potential criminal violation of Utah Code 63G-6a-2401. In July 2015, Ms. Davis also reported (Exhibit 118) the suspected violation, through Mr. Wilson, to the Attorney General's Office pursuant to Utah Code 63G-6a-2407.

161.    Ms. Davis was concerned about this purchase because she was responsible for the Office of Software Licensing ("OSL"), which included renewing the overall Microsoft Campus Agreement ("MCA") (Exhibit 119). She had met with all the major MCA-related stakeholders (Mr. Livingston, Mr. Ekstrom, Ms. Kuhn, Ms. Post) over a three month period in early 2015 to gather their requirements and posted a Request for Proposal with the help of the Purchasing Department, as required by the University's purchasing policies (Exhibit 42). During her requirements-gathering meetings, Ms. Davis discovered that Mr. Ekstrom had met multiple times with the Microsoft representative, Keith Ward, including on a trip organized by Mr. Ward to Microsoft's Executive Briefing Center, in Seattle. This

trip was during the MCA RFP pre-purchase period (Exhibit 120). She learned from Ms. Kuhn, Mr. Ekstrom and Ms. Post that Microsoft had verbally promised the University certain discounts if the University would add Azure and Lync (2 new Microsoft products) to the Microsoft Campus Agreement renewal. Ms. Davis was unclear if the discounts violated purchasing policy (Exhibit 54) (receiving goods or services without payment) but she was certain that Lync and Azure should have been put out to bid, and not rolled into the MCA's renewal RFP.

162.    Ms. Davis discussed this with Mr. Ward and he eventually confirmed the discount structure and the various meetings they had had with Mr. Ekstrom and other UIT leadership. Mr. Ward, explained that he felt it was his job to meet with all the stakeholders on campus and when Ms. Davis suggested he should work only with her and purchasing because she was responsible for getting the renewal completed by the 31 May 2015 deadline, he agreed, but then went around Ms. Davis and continued to meet (Exhibit 121) with UIT management in several private meetings, mostly one-on-one with individual UIT managers.

163.    Ms. Davis complained about this to Ms. Kuhn many times (Exhibit 112), because (Exhibit 122) she knew that she wouldn't be able to negotiate effectively with Microsoft, because Microsoft was getting inside information from Mr. Ekstrom. Once Mr. Ekstrom told Mr. Ward that he wanted Azure, Ms. Davis had no room to negotiate. She felt it was inappropriate for Microsoft to roll the purchase of Azure into the MCA renewal because the MCA was a renewal for existing software licenses that are used campus-wide, whereas Azure is new cloud storage solution (not software) only for Mr. Ekstrom (not campus-wide) and it was a new product (not a renewal). As with the purchase of any new product, the purchase needed to comply with State and University purchasing protocols and be put out to competitive bid, as there are competing products from other vendors (such as Amazon, Google, etc.) that are potentially more cost effective, that were being overlooked, and hence Ms. Davis's concern

about waste, abuse and possible violations of the laws, regulations and rules. On a call with Ms. Kuhn and Microsoft, Keith Ward confirmed he was going to add Azure to the MCA. Despite Ms. Davis's protests, Ms. Kuhn supported Mr. Ward on the call, not Ms. Davis.

164.     During a meeting with Mr. Hess, Ms. Kuhn, Mr. Livingston and Peter Panos (the Finance Manager under Ms. Kuhn), Ms. Davis asked them if they agreed that she, as the Associate Director for Strategic Vendor Partnerships, should be the point of contact during the MCA negotiation and renewal. They agreed, so she notified Mr. Ward. Mr. Ward, however, ignored this request (Exhibit 121). He apparently felt Ms. Davis was keeping him from upselling to his customers and forcing him to comply with purchasing policy, which Ms. Davis believed he was seeking to bypass, to prevent his competitors from potentially winning the business.

165.     Because Mr. Ward insisted on rolling Azure into the MCA, it was delaying Ms. Davis's ability to close the MCA bid process and get the MCA signed by the 22 May 2015 deadline. Accordingly, she escalated (Exhibit 112) to Ms. Kuhn that she shouldn't have to do an additional RFP for Mr. Ekstrom. Ms. Davis was already overloaded with her own RFP for the MCA, and doing an RFP for Azure would have taken significant time to complete correctly and would have undermined the MCA. Ms. Kuhn did not support Ms. Davis. Instead, Ms. Kuhn sent Ms. Davis the nearly 40 page Azure agreement (Exhibit 123) that Mr. Livingston had signed two years earlier for the University Hospital, and directed Ms. Davis to complete the Azure RFP.

166.     Ms. Davis worked late that evening in order to accommodate Ms. Kuhn's instructions, and reviewed the hospital's Azure agreement to learn how Azure was metered and sold, then prepared detailed questions and sent (Exhibit 124) them to Mr. Ekstrom and Mr. Livingston, copying Ms. Kuhn, and Mr. Hess. Only Mr. Livingston responded (Exhibit 118). He wrote that he was busy, would

consider possible involvement with the new Azure RFP, but was going on vacation. He never followed up. Mr. Ekstrom never responded to the questions.

167.    Ms. Davis escalated (Exhibit 125) to Mr. Hess her concerns and reluctance to work on pushing through the Azure bid when she had no clear requirements (Exhibit 124) from Mr. Livingston or Mr. Ekstrom. She felt Mr. Ward was mistaken that she could/should roll it into the MCA. She told Mr. Hess that enough due diligence had not been done. Mr. Ekstrom wanted the storage because of a recent network outage, but until the Root Cause Analysis ("RCA") had been done on the reason for the outage, no one should jump to the conclusion that buying Azure would prevent future similar outages. There was yet no clear link between buying Azure as a solution to prevent further network outages. She was uncomfortable that Mr. Ekstrom was opting exclusively for a Microsoft solution (Amazon had a competing product) (Exhibit 126) after he had just returned from a Microsoft trip. Mr. Hess told Ms. Davis (Exhibit 125) that he would discuss the due diligence with Mr. Ekstrom and that Ms. Kuhn would take care of getting the Azure bid pulled together.

168.    Ms. Davis found out two days later that Ms. Kuhn had had at least one more discussion with Mr. Ward, and that Ms. Kuhn was pushing an Azure bid through despite Ms. Davis's concerns. Ms. Kuhn told Ms. Davis that Ms. Kuhn thought only one reseller could respond which would make this easier to "push through." Ms. Kuhn shortened the bid period to five days, including the weekend. Ms. Davis saw the bid document and considered it much too vague (Exhibits 127, 128 and 129). Ms. Davis is not a cloud storage expert, but she knew that Azure was a complex solution after studying Mr. Livingston's 40 page hospital Azure contract and that Azure is not simply a commodity product that you can buy off the shelf.

169.    In addition, the Azure RFP attempted by Ms. Kuhn specified that the bidders had to be Net+ certified resellers, which meant they had to have signed a distribution agreement with Internet2, a

vendor that Mr. Corbato openly favored (Exhibit 65) and who was his former employer. Ms. Kuhn and Mr. Ward were able to prevent other vendors of "equivalent" competing products from responding, and only Mr. Ward's preferred resellers could respond in the shortened timeframe.

170. On Friday, 15 May 2015, after Ms. Davis had sent numerous emails (Exhibit 130) to Microsoft, Mr. Ward finally confirmed to her in writing (Exhibit 131) that Microsoft was going to give UIT some licensing discounts for buying Azure, that there would be a separate contract for Azure, and it would not be rolled in with the MCA. However, because Ms. Davis's OSL cost-saving function (Exhibit 8) was precluded by the pre-purchase meetings between UIT leaders and Microsoft, she could not negotiate with Microsoft on the MCA and the University was prevented (Exhibit 132) from purchasing its renewal software at the lowest (Exhibit 132) price.

171. Ms. Davis believed UIT misled the Purchasing Department to fast-track the bid process for Azure by colluding (Exhibit 65) with Microsoft so UIT and Microsoft could get the outcome they were looking for without doing the necessary due diligence, RCA and without issuing a detailed RFP following a competitive product analysis of cloud storage options. After Ms. Davis raised these concerns, instead of following the applicable policies (Exhibit 54), Mr. Hess and Ms. Kuhn took the project away from her, continued with it regardless, and pushed it through.

172. Ms. Davis continued to be concerned about the Azure purchase so on May 19, 2015, Ms. Davis sent the following email to Fred Ericksen who was working on the ongoing IA:

Hi Fred
Update on Azure from this week:

Monday - Lisa tried to get me to take over the bid process. The bid closed on Monday, 2 responses, Dell and Insight. Neither are authorized to sell Internet2 flavor of Azure. So she is going to open up the process again. She is working directly with purchasing.

Today Tuesday - she told me (in front of Peter Panos) that she had told Keith/Microsoft to tell SHI to respond. She doesn't think anyone else is authorized to sell it but even if

they are, she isn't providing purchasing with the alternate reseller details. And I doubt Microsoft will contact them. So we'll probably only get the one bid. both Lisa and Keith want to wrap this up quickly since they want to get the agreement signed as close to the campus agreement as possible, given the interdependency on discounts (we are getting discounts on the campus agreement only if we commit $150,000/year for 3 years on Azure.

173.    On September 23, 2015, Ms. Davis reported these suspected violations of University procurement policy (Exhibit 133) and other suspected problems to the Utah Attorney General by emailing  (Exhibit 118) Lori Noe, the Administrative Assistant, and, according to the website for the Attorney General's Office, the point of contact for that office.   In order to discuss the suspected unlawful conduct, Ms. Davis made this report and requested a meeting, pursuant to Utah Code section 63G-6a-2407 (Exhibit 172):

> (1) A procurement professional shall notify the attorney general or other appropriate prosecuting attorney if the procurement professional has actual knowledge that a person has engaged in:
> (a) conduct made unlawful under this part; or
> (b) conduct, including bid rigging, improperly steering a contract to a favored vendor, exercising undue influence on an individual involved in the procurement process, or participating in collusion or other anticompetitive practices, made unlawful under other applicable law.

174.    Subsequently, Ms. Davis's concerns (Exhibit 32) about the impropriety of steering a contract for Azure to Microsoft and its preferred reseller was distorted in the IA as Concerns # 27, # 30, # 31, # 32 and # 33 (Exhibits 134, 135, 136, 137 and 138).  Concern # 27 states Ms. Davis's concern as "Microsoft Azure was added to the MCA (should have had its own RFP). Violation of procurement law."  This largely misstates Ms. Davis's concern.  Microsoft Azure was never added to the MCA, and Ms. Davis never complained that it was.  UIT management wanted Ms. Davis to add Azure to the MCA, but that was not possible---the MCA governs software, Azure is cloud storage.  Microsoft has separate and distinct agreements for these different products because they apply different technologies, involve different usages and require different terms and conditions.

175.    The IA's "Conclusion" (Exhibit 134) to Concern # 27 similarly misunderstands or misstates the concern Ms. Davis raised about the suspected violations of procurement policies. Concern # 30 (Exhibit 135) stated Ms. Davis's purported concern that "Azure was removed from the MCA bid and received its own RFP that was limited and vague and did not follow Utah procurement code's five day bid instead of 7 day bid." Ms. Davis had no concern that Azure was removed from the MCA bid because, for the reasons stated previously, it was never part of the MCA bid. Ms. Davis's concern was about improperly steering a purchase for Azure. Her written concern (Exhibit 32) stated, in part: "I think UIT is deliberately mis-leading purchasing and/or trying to bend purchasing rules so they can get the outcome they are looking for without doing the necessary due diligence and competitive product analysis." Indeed, Ms. Kuhn had informed Ms. Davis that she thought only "one reseller" could respond which would make this easier to "push through." The IA Conclusion (Exhibit 135) to Concern # 30 that "[t]he statement that the Azure bid did not comply with procurement laws is incorrect," simply misses the point that Ms. Kuhn was improperly using the bid process to steer a purchase for cloud storage to Microsoft and its resellers.

176.    In addition, the IA's Conclusion to Concern # 30 (Exhibit 135) "that the Azure bid did not comply with procurement laws is incorrect," is itself incorrect. The IA revealed in an Audit Finding related to Concern # 32 (Exhibit 137) that the eventual reseller (the one with the lowest bid) from whom Azure Net+ was purchased was not even "eligible" to submit a bid as of the bid deadline in order to sell Microsoft's Azure Net+ to UIT. Therefore, the acceptance of that bid for the purchase of Azure Net+ from that reseller violated Utah Code section 63G-6-604(3), which states:

> (a) The procurement officer shall reject a bid if the bid is not responsive or the bid is submitted by a bidder who is not responsible.
> (b) A bid that is not responsive includes a bid that:
> (i) is conditional;
> (ii) attempts to modify the bid requirements;

(iii) contains additional terms or conditions; or

(iv) fails to conform with the requirements or specifications of the invitation for bids.

(c) A bid that is submitted by a bidder who is not responsible includes a bid where the procurement officer reasonably concludes that the bidder or an employee, agent, or subcontractor of the bidder, at any tier, is unable to satisfactorily fulfill the bid requirements.

(4) An issuing procurement unit may not accept a bid after the time for submission of a bid has expired.

As admitted in the University's IA, the reseller was not "eligible" to submit a bid, Concern # 32 (Exhibit 137), and according to the IA's Conclusion to Concern # 31 (Exhibit 136), because the targeted product was "Azure [there] needed to [be] an Azure Net+ reseller." Thus, when a bid was submitted by an ineligible reseller, that bid it should have been rejected. Ms. Davis's concern about suspected violations of purchasing policies and laws had merit.

177. IA Concern # 31 (Exhibit 136) correctly states Ms. Davis's suspected violation of purchasing policies: "Azure was listed by name in the RFP. A RFP should have been sent out for all cloud data storage providers." She was concerned that UIT was steering a purchase to Microsoft by identifying a specific Microsoft product, Azure Net+, on the BidSync system. Purchasing policies (Exhibit 139) require that the technical features be specified in the RFPs sent out through BidSync, not just product names. At a minimum, the product name should have been followed by the qualifiers "or equivalent" or "or equal" and then by the technical specifications. Here, the RFP (Exhibit 127, 128, 129) was sent out over BidSync with the product name stated, without the qualifier "or similar" of "or equal" and without a list of the technical features. This steered the cloud storage purchase to Microsoft even though other similar products or solutions (Amazon and Google or the DDC) were available and should have been investigated. UIT's Response to Concern # 31 (Exhibit 136) admits the problem: "It was determined that Azure was the cloud storage that UIT was going to be using. The RFP correctly stated the product was Azure and needed to have an Azure Net+ reseller." The IA Concern # 31

Conclusion (Exhibit 136) that, despite the applicable policies, it was within the "prerogative" (Exhibit 140) of UIT management to send the RFP in question out on BidSync is incorrect.

178.    Concern # 32 (Exhibit 137) attributes to Ms. Davis's a complaint that "Lisa Kuhn contacted the Microsoft sales rep and told him to tell one reseller to respond to the Azure bid."  Ms. Davis did not state this concern, but she did raise concerns over what she saw as collusion between some UIT managers and Microsoft resulting in UIT improperly steering a cloud data storage purchase to Microsoft, as stated in reference to Concern # 30 (Exhibit 135) as alleged above.

<h3 style="text-align:center">MANHOLE AND COMMUNICATIONS SECURITY</h3>

179.    The University campus is served by a vast underground communication infrastructure consisting of some estimated 6,000 miles (Exhibit 141) of fiber-optic cable and unknown miles of copper lines.  This communication infrastructure is essential to the functions of the University, if not much of Utah, and is one of the University's most expensive and valuable assets.

180.    This underground communication infrastructure is contained in enclosed spaces (Exhibit 142) which are accessible from above ground through some 290 manholes.  These manholes and the enclosed spaces, as well as the communication network contained therein, are specifically the responsibility of UIT.  Because of the high value of the communication infrastructure and the need to protect its critical function, the University adopted a policy (Exhibit 143) requiring that the system be secured by locked or secured manhole covers.  Securing manhole covers prevents access to the communication system by unauthorized vendors and vandals, and assures that the at-risk University employees who enter the system have University Environmental Health and Safety ("EH&S") training and permits.

181.    To obtain an EH&S permit to enter an enclosed space, University employees and vendors are required by the University's EH&S Department policies, which incorporate Utah OSHA regulations

regarding confined spaces, to have a safety plan, specific training, and rescue and environmental equipment, as set forth on the University's EH&S website (Exhibit 144) before entering confined spaces, including "tunnels" and "underground utility vaults". This includes Respiratory Program, Compressed Gas, Ladder Training, Fall Protection, and Respiratory Protection (Exhibits 145, 146, 147, 148 and 149).

182.    In addition, to enter and access the system, the University's permission is required as evidenced by a right of entry agreement (Exhibit 150) that sets forth, inter alia, the purpose for entering, scope of the work to be done, limitations on access and the vendor fees to be paid to the University for utilizing the University's existing infrastructure. When a University employee or vender enters an enclosed space, they are also required by policy (Exhibit 151) to post their EH&S permit (Exhibit 152) above ground in the work/manhole area.

183.    For safety and security purposes, some manhole covers were welded shut before the Olympics in 2002 and other covers were secured with the installation of an expensive locking cage affixed to the bottom of the manhole cover, but by the time Ms. Davis and Mr. Wilson were employed, most of the manhole covers were no longer secure—either the weld had been ground off or the locking cage had broken or been disabled. As a result, virtually none of UIT's 290 manhole covers on the campus are secured. Each unsecured manhole is a weak link in the University's communications security chain.

184.    Fortunately, to date, there has been no known significant vandalism of the University's vital communication system, but it was reported (Exhibit 153) in the media that in 2010, twelve contractors working underground in one of these confined spaces were severely injured by an accidental discharge of high temperature, pressurized steam and chemical-laced-water. Additionally reported (Exhibit 154) in the media, a UIT fiber team member had to be extracted from within a UIT man hole by

Salt Lake Fire Department after the UIT fiber manager called 911, having fallen 15 feet and injured his ankle and back.

185.    The University has a Confined Space Entry Program (Exhibit 155) that places on UIT the responsibility for the manholes, confined spaces and utility vaults, etc., that serve the University's communication infrastructure.    This responsibility includes securing manhole covers to prevent unauthorized access, training University employees, assuring that the employees of vendors are trained and granting or withholding permission to access the communication Infrastructure through the use of right to access agreements (Exhibit 150) or similar instruments.

186.    Following the 2010 accidents, in or about May 2014, Jordan Juarez, a Fiber Team member, raised his concerns over the ongoing lack of EH&S training and equipment to Mr. Wilson, who was then working as a contractor at the University, and to Ms. Davis, seeking their assistance.    When Mr. Wilson became an employee of the University on 1 July 2014 as Senior Product Manager over fiber, he scheduled confined space training for his Fiber Team with EH&S as shown in an email (Exhibit 156) between Mr. Ekstrom and his assistant.    That training, scheduled for 17 October 2014, was canceled by Ms. Post even though Mr. Wilson had instructed his Fiber Team that "nobody on the UIT fiber team is permitted into any confined space including manholes" until they were trained and safety plans, equipment and permits were obtained.

187.    Following the 2010 accidents, on 15 July 2014, a "Monthly [R]eporting for November 2013" (Exhibit 157) was  forwarded by Mr. Kosanke to Mr. Wilson and Mr. Ekstrom, confirming that UIT staff and potentially student-staff had entered into confined space manholes without proper training or safety equipment in order to conduct a survey of the fiber and cable communications network. The report indicates that 231 of the 290 "manholes have been surveyed."  As of 1st July 2014, Mr. Wilson had instructed his Fiber Team not to enter confined spaces without the required training, safety plan,

safety equipment and permit, but, regardless, Mr. Ekstrom directed (Exhibit 158) members of Mr. Wilson's fiber staff to enter confined spaces. When Mr. Wilson learned of this, he respectfully objected to this disregard of the University's EH&S safety policies, but this resulted in friction with members of UIT management.

188.    Throughout Mr. Wilson's employment, Mr. Ekstrom and other UIT mangers would give lip service to University-mandated safety requirements, while canceling training and pushing University employees to risk their safety and violate University policies. In other words, the message was "we want to comply with all the safety requirements, but do you have the work done yet?" This placed Mr. Wilson in the untenable situation of having to choose between following University policies and potentially offending UIT leadership or risking his Fiber Team's safety. Mr. Wilson chose Safety First, and followed the University's policies and did his best to avoid risking his job, but was eventually "separated from probationary employment".

189.    Previously in July 2014, Mr. Ekstrom had come to Mr. Wilson and asked him to look into the problem of vendors entering UIT's manholes to run fiber-optics often without UIT's knowledge or permission. Mr. Wilson suggested that the Manhole covers be secured to prevent unauthorized entry, but was told that the approved locking system was too expensive, costing $1,550.00 per manhole for parts alone. In August of 2014, Mr. Wilson came up with a simple method (Exhibit 159) of locking UIT's manhole covers at a cost of $250.00 each for parts and labor. Mr. Wilson's method was demonstrated and praised.

190.    For example, on 28 August 2014, Mr. Ekstrom, sent an email (Exhibit 160) about Mr. Wilson, to Mr. Wilson, Mr. Corbato and Daniel Bowden, stating:

Great Job!

Dan and Steve, you can only appreciate the win if you [have] seen the solution we had before. If you have a chance to see this simple and effective solution they put together please don't hesitate.

191. In turn, Mr. Wilson sent an email (Exhibit 161) passing the praise onto his fiber team:

Congratulations to the Fiber Group; Destry, Jordan, and Christian.
Our manhole security bolt project has passed an important step today. It has passed the "Proof of Product" stage and is fully installed outside of BLDG. #350 manhole number M344. Feel free to stop by and look it over. Next step is proof of concept where we compare this solution to other already existing processes. (updates to follow)

Unfortunately, this "simple and effective solution" was not implemented by UIT.

192. Subsequently, the IA report (Exhibit 162) released in October 2015 recommended that UIT reconsider its decision not to implement the solution proposed by Mr. Wilson; but the solution has still not been adopted and the University's vital communication network remains unprotected.

193. On Thursday, 11 December 2014, Mr. Wilson and a Fiber Team member observed that a CenturyLink crew had opened several of UIT's manholes and entered a fiber vault and conduit system without UIT's knowledge or permission and without the required EH&S confined space permit (Exhibit 152). Further investigation showed that the crew was not servicing the University, but rather was servicing a branch of the University Credit Union, a for-profit entity, that was not even operated by or for the University. A few weeks before, a CenturyLink crew, had caused a major fiber outage at the USTAR building on the University campus which was documented in an Outage Report (Exhibit 163).

194. Mr. Wilson was responsible for addressing the unauthorized work he had discovered, but because he was under significant pressure for his previous efforts to protect other University's assets and employees and because he had by then been described by Mr. Corbato as "a cancer that needed to be cut out" (Exhibit 164) for doing so, he called Ms. Davis and asked her to join him outside the Eccles Broadcast Center (EBC) building where the CenturyLink crew was working. Ms. Davis arrived from her office in EBC, and Mr. Wilson called Mr. Ekstrom, his supervisor, to report the problem. Mr.

Ekstrom tried to deflect the problem to Ms. Post, but Mr. Wilson could not reach Ms. Post. Eventually, Mr. Ekstrom reluctantly agreed that Mr. Wilson should require the CenturyLink crew to leave until they had the required permits and permission.

195.    If UIT leadership had been in compliance with the University's requirement to "secure University assets from theft or damage" (Exhibit 57) and had been following University policy (Exhibit 143), CenturyLink would have contacted UIT and EH&S in advance and an appropriate process could have been followed, and Mr. Wilson would not have been placed in the difficult predicament of discovering CenturyLink in an unsecured, enclosed space and would not have been required to ask the crew to leave. This event illustrates how Mr. Wilson's ongoing efforts to comply with University policies embarrassed, frustrated and even angered UIT management against him.

196.    Mr. Corbato openly favored a special relationship (Exhibit 65) with CenturyLink that he protected. Indeed, there was a long standing relationship between UIT and CenturyLink based on "agreed to long term infrastructure support" in which "concessions have been made in the past." When this favored relationship was made known to Mr. Wilson via email (Exhibit 165) from an Associate Director of UIT, he was also told that "[i]t is clear that [CenturyLink] is not following any process to notify us of changes or to request access, it is possible that they have never been informed of one."

197.    Although Mr. Wilson took appropriate action to address CenturyLink's unauthorized access, as confirmed by this Associate Director, this instance highlights UIT management's ongoing dilemma with Ms. Davis and Mr. Wilson: UIT leaders had to balance the preservation and protection of University resources and employees as was being accomplished by Ms. Davis and Mr. Wilson through their knowledge, expertise and compliance with University policies against UIT management's personal interests and being unwittingly embarrassment by Ms. Davis and Mr. Wilson as they encountered, revealed and attempted to correct management's waste and misuse of public resources. Unfortunately,

UIT management, led by Mr. Corbato, chose poorly and decided to protect their personal interests over those of the University.

198.     On 15 December 2014, four days after Mr. Wilson, supported by Ms. Davis and reluctantly supported by Mr. Ekstrom, required the CenturyLink crew to stop working underground until it had obtained the required permits and permission, Mr. Corbato and Mr. Ekstrom fired Mr. Wilson for his "unwillingness to collaborate with co-workers and colleagues throughout campus in a collegial manner."  In reality, UIT management did not want to hear they were violating University policies and misusing public funds, property and manpower.

199.     During his nearly six months of employment, Mr. Wilson accomplished much for the University and the tax-payers who fund it, and had collaborated well with co-workers and colleagues throughout the University, and had done so in a collegial manner resulting in dozens of emails (Exhibit 166) from his co-workers, colleagues, UIT management (Exhibit 160) and others, including other universities with whom he had collaborated, many of whom had taken the time to write to complement him on his work, assistance and success as an employee of the University.  One email (Exhibit 24), sent the day after Mr. Wilson was fired to Mr. Nixon from the Associate Vice Chancellor of IT and CIO at the University of Colorado at Boulder, states:

> Thank you for allowing Jasmin Davis and Barry Wilson to visit with us and help develop our cellular strategy.  They provided invaluable input and helped us understand how we could shift our strategy from one based upon a 3rd party vendor to one we can pursue directly with the carriers.   They have tremendous industry experience and have opened our eyes on how we approach solving our campus cellular problems both in the sports venues as well as the rest of campus.  Their consultative approach was critical in all our meetings with our stakeholders and wireless providers and I was amazed at how quickly they were able to mobilize and to assist us in developing our wireless planning strategy.
> I am hopeful that the Utah/Colorado consortium they are pulling together will yield cost savings with the equipment providers and leverage our influence with the carriers.  I look forward to further collaboration among our universities and would look for CU-Boulder to return the favor at some point.

200.     The confined space, safety and policy violation issues raised by Mr. Wilson during his employment are generally referenced as Concerns # 53 and # 54 in the IA.  As restated in Concern # 53 (Exhibit 167), Mr. Wilson complained that the "[f]iber installation team was not properly trained.  They did not have confined space training or hazardous material training.  [Mr. Wilson] set this [training] up and management cancelled."  Similarly, Concern 54, reflects Mr. Wilson's worry about "[s]afety issues even after the 'steam accident' where multiple people were injured. – No Safety officer or manager, no confined space training, and many others."

201.     UIT's dismissive responses in the IA to these concerns contain UIT's typical lip service: "All appropriate training is supported and encouraged by management.  There are two full-time experienced on-site fiber staff," Concern # 53 (Exhibit 167), and "[w]e value the safety of all staff," Concern # 54 (Exhibit 168), but the fact remains that none of the six employees working under Mr. Wilson on the fiber team had enclosed space training as required by the University's EH&S policies. The University EH&S Department's comment to Concern # 53 (Exhibit 167) confirms that "No UIT employees have attended these trainings. [and] . . . EHS has not received any verification of training for fiber installation staff."   Indeed, UIT placed production above employee safety.  In response to Concern #53, UIT stated: "Due to a major operational event, impacting campus, these staff had to be called back from their training in order to meet University expectations."

202.     UIT also acknowledged in response to Concern # 54 (Exhibit 168) that it does "not have a safety officer or manager at UIT."   The AI continued: "In August and September of 2015 UIT provided some safety training and have [sic] others classes planned."  In contrast with EH&S' statement, UIT claims in the IA in response to Concern # 53 (Exhibit 167) that in August and September of 2015— some eight and nine months after Mr. Wilson was fired---it provided "some training".   Additionally, according to UIT, some kind of "safety training is included in the budget for FY2016."

203. UIT is further quoted in the IA at Concern # 53 (Exhibit 167), stating "that individual managers are responsible for obtaining the proper training for their teams." Yet, Mr. Wilson was prevented from having his team trained in October 2014. And, according to the "Audit Findings," (Exhibit 167) after the termination of his employment, training scheduled for June of 2015 was again canceled due to the claimed urgency of projects.

204. The IA Findings further attempt in Concern # 54 (Exhibit 168) to justify the lack of training: "The 'steam accident' referred to by Mr. Wilson did not involve UIT or UIT personnel." While the IA acknowledges that incident (Exhibit 153), which injured many, it also diminishes the clear requirement of complying with University EH&S policy and the incorporated Utah OSHA regulations in response to Concern # 53 (Exhibit 167) by stating "that the fiber installation team hasn't received safety training" so "[w]e **recommend** that UIT **consider** giving this higher priority." (Emphasis added). Similarly in response to Concern # 54 (Exhibit 168), the IA merely states "we **recommend** that safety training be given higher priority." (Emphasis added). Tellingly, the IA contains no reference to another manhole/confined space incident in 2010 (Exhibit 151) in which a UIT Fiber Team member, who had not been trained or properly equipped, was injured in one of UIT's confined spaces.

205. UIT continues to put production over safety by having its at-risk fiber and cable teams (some of who are students working for UIT on a part time basis) enter confined spaces without the requisite safety training and equipment.

206. Finally, the IA further employed glossy language to address the issue of vendor access to confined spaces in Concern # 24 (Exhibit 169). "Conclusion: While there is a procedure in place for vendors to gain authorized access to conduits, it appears possible for vendors to gain unauthorized access and/or install incorrect product. Unauthorized access could involve safety and security, as well as financial, concerns. We **recommend** that UIT develop a plan to address this issue." (Emphasis

added). Stated without the gloss, Mr. Wilson acted appropriately in asking CenturyLink to leave until they had the required permission from UIT to open the manhole and the required permit from EH&S to enter the confined space.

## A PATTERN OF WASTE AND ABUSE OF PUBLIC RESOURCES

207.    During their employment, Ms. Davis and Mr. Wilson reported in good faith other instances of suspected waste and misuse of public resources and related suspected violations of law. These other instances fit generally within one or more of the patterns of improper conduct---$150k Fabricated Purchase Order for Americom; Failure to Charge for Power Bills; Unnecessary DAS Expenditures; Unauthorized Amendment to Campus-Wide DAS/Lease Agreement; Downtown Data Center Money Pit; Improperly Steering a Purchase of Azure; and Manholes and Communications Security---as alleged above.

208.    In accordance with Ms. Davis's and Mr. Wilson's reporting obligations (Exhibit 15), as Utah and University employees, they initially brought these additional matters to the attention of their respective supervisors.  Rather than welcome Ms. Davis's and Mr. Wilson's efforts to curtail this additional misuse of public funds and insist on compliance with University policies, however, UIT management generally resisted their efforts, saw their efforts as embarrassing to UIT management, worked to preserve the status quo, retaliated against them, labeled Mr. Wilson "a cancer that needed to be cut out," and ultimately terminated their employment.

209.    The University also had its Risk Management and Internal Audit Departments, under the direction of the Office of General Counsel, prepare an IA that downplayed, misconstrued and in many instances tried to justify or explain away the reported waste and misuse of resources and the failure to follow required policies.  The IA, which took five months to complete, went much further than needed for a waste and misuse of public resources audit and improperly attempted to justify Ms. Davis's and

Mr. Wilson's terminations. An example of this involves Mr. Corbato telling Mr. Ekstrom that Mr. Wilson was a cancer that needed to be cut out. In the IA, Mr. Ekstrom denied he was told that, but according to Concern # 58 (Exhibit 18): "Sylvia Jensen, Associate IT Director for the School of Medicine, stated that she overheard a discussion between Dr. Corbato and Mr. Ekstrom. She said that she overheard Dr. Corbato encourage Mr. Ekstrom to terminate Mr. Wilson and said that during the conversation Dr. Corbato referred to Mr. Wilson as a 'cancer.'"

210. The IA then relies on the University's Human Resource Department to offer an excuse for this comment, but that excuse in Concern # 58, and the IA generally, ignore the context in which the statement was made: the fact that Mr. Corbato was angry with Mr. Wilson for escalating reports to Mr. Corbato's boss, Mr. Nixon, regarding the waste and misuse of public funds and the failures to comply with policies---problems that Mr. Corbato did not want to acknowledge. Indeed, Mr. Wilson had met earlier on the day that statement was made with Mr. Nixon. Without acknowledging this context for UIT management's improper motivation to terminate Mr. Wilson (and Ms. Davis), the IA, at Concern # 58 (Exhibit 18), relies on the Human Resource Department's "understanding" from UIT management that Mr. Wilson is accurately described as "malignant":

> . . . If the term "cancer" was used, we do not believe that it was being used in the clinical sense. There are alternative, non-clinical definitions of cancer which include something malignant that spreads destructively. This is an accurate characterization of UIT's concerns and perceptions related to Mr. Wilson's behavior. It is within the normal scope of management activity for Mr. Wilson's supervisors/managers to discuss their concerns about the proliferation of Mr. Wilson's poor workplace behavior, the overall impact on the department and University, and how to best move forward.

211. The IA upon which the University and UIT relies to justify the terminations of Ms. Davis and Mr. Wilson also ignores the broader context: (a) all Utah and University employees are required (Exhibit 15) to report waste and misuse of public resources and related suspected violations of the law; (b) their supervisors should have responded by working with them to correct (Exhibit 16) the problems;

(c) their supervisors should not have responded by retaliating; (d) Ms. Davis and Mr. Wilson were required to escalate (Exhibit 15) their concerns to their supervisors' supervisors once it was apparent that no or inadequate action to correct the problems was being taken; (e) Ms. Davis and Mr. Wilson should not have been retaliated against and terminated (Exhibit 2 and Exhibit 26); (f) the IA should have been an independent audit and not conducted by Risk Management, whose job it is to prevent litigation (including litigation brought pursuant to the UPPEA (Exhibit 1) by terminated employees), under the Office of General Counsel; and (g) the IA should have focused on correcting the problems, not supporting the prior terminations.

212.    Instead of working with Ms. Davis and Mr. Wilson to protect public resources, at nearly every stage, UIT management and University administrators expended public resources to thwart Ms. Davis's and Mr. Wilson's efforts to save taxpayer funds, expended public resources on a five month IA to try to justify their terminations, and are now, at taxpayer expense, defending against claims brought under the UPPEA which is intended to protect whistleblowers.

## FIRST CLAIM FOR RELIEF
### (Wrongful Termination and Retaliation in Violation of Public Policy)

213.    Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

214.    As a public employer, the University took adverse action against Ms. Davis and Mr. Wilson because they communicated the waste or misuse of public funds, property or manpower or communicated the violation or suspected violation of laws, rules or regulations adopted by Utah and/or the University---all in violation of Utah Code section 67-21-3(1)(a).

215.    Ms. Davis and Mr. Wilson are presumed to have communicated in good faith because they gave written notice or otherwise formally communicated the waste of public resources or suspected

violations to a person in authority over the persons engaged in the waste or misuse of public resources or the suspected violations or to the entity that conducts audits of the University---all in violation of Utah Code section 67-21-3(1)(b).

216.     The University took adverse action against Ms. Davis and Mr. Wilson because they objected to or refused to carry out directives that they reasonably believed violated a law or regulation of Utah or the University---all in violation of Utah Code section 67-21-3(3).

217.     The University implemented rules or policies that unreasonably restricted Ms. Davis and Mr. Wilson's ability to document the waste or misuse of public funds, property or manpower, violations or suspected violations of any law, rule, or regulation, or  gross misconduct, abuse of authority or unethical conduct---all in violation of Utah Code section 67-21-3(4).

218.     As a direct and proximate cause of these violations of the UPPEA, Utah and the University are liable to Ms. Davis and Mr. Wilson separately for reinstatement at the same levels of employment they had prior to their terminations (and in the case of Ms. Davis a promotion to UIT Director for Vendor Relations as of August 2014), the payment of back wages, full reinstatement of fringe benefits and seniority rights, and general and special damages---all as provided under Utah Code sections 67-21-5(1) and 67-21-2(4) and as prayed for below.

219.     The UPPEA provides for an award of attorney fees and costs incurred by prevailing plaintiffs in an action brought under its provisions.  Ms. Davis and Mr. Wilson have employed and will continue to employ an attorney for the initiation and prosecution of this action. They have incurred and will continue to incur attorney fees and costs and are entitled to an award of attorney fees and costs, pursuant to Utah Code section 67-21-5(2).

## SECOND CLAIM FOR RELIEF
### (Termination in Violation of Clear and Substantial Public Policy)

220.    Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

221.    The University as an interest in regulating its workforce, but that interest is subordinate to certain clear and substantial public policies that favor the rights of employees and give employees the right to sue their employers for wrongful termination.

222.    Specifically, clear and substantial public policies in Utah provide employees with a basis for wrongful termination and other claims when adverse action is taken against them for exercising their legal right or privilege to report the violation or suspected violation of laws, rules, or regulations designed to prevent the waste or misuse of public resources.

223.    Moreover, clear and substantial public policies in Utah provide public employees with specific remedies---no less than those contained in the UPPEA---when adverse action is taken against them by public employers who also attempt to deny the public employee the remedies and protections of the UPPEA.

224.    The public policies at issue here are reflected in authoritative sources of Utah public policy through legislative enactments, constitutional standards, and judicial decisions, including, but not limited to, the UPPEA, Utah Code section 67-21-1, et seq.;  Utah OSHA, Utah Code section 34A-6-203(1) and the unlawful conduct provisions of Utah Code 63G-6a-2401, et seq.

225.    These policies affect the public generally as opposed to the private interests of employees and employers, and are of overarching importance to the public, as opposed to the parties.

226.    No countervailing policies outweigh the public policies at issue here because they confer a benefit on the public and there can be virtually no question as to their importance to the public good.

227. Therefore, Utah public employees, such as Ms. Davis and Mr. Wilson, who report waste or abuse, are exercising legal rights that embody clear and substantial public policies.

228. Moreover, public employers, such as Utah and the University, who terminate public employees in retaliation for their employees' exercise of those rights violated clear and substantial public policies and may be sued for their adverse actions, including the failure to promote and for wrongful discharge from employment.

229. By their conduct, in denying Mr. Wilson the opportunity of appealing his termination, Utah and the University are estopped from claiming that he is entitled to less than the specific remedies and protections contained in the UPPEA as consequential damages, including reinstatement at the same level of employment he had prior to his termination, the payment of his back wages, full reinstatement of his fringe benefits and seniority rights, general and special damages, and payment of his attorney fees and costs---all as provided under Utah law and as prayed for below.

230. For example, on June 6, 2016, the University of Utah notified (Exhibit 170) counsel for Mr. Wilson that "Barry Wilson's claims under Title 67 Chapter 21 of the Utah Code are not timely." This statement, which accompanied other inaccurate statements, is the very kind of claim or defense that the Utah and the University are estopped from making.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, demanding a trial by Jury, pray for judgment against Defendants as follows:

1. For Ms. Davis's and Mr. Wilson's separate general damages in amounts to be awarded at trial in accordance with Utah Code section 67-21-5(1) and common law;

2. For the failure to promote Ms. Davis, reinstatement with the title of Associate Director UIT for Vendor Partnerships in accordance with Utah Code section 67-21-5(1) and common law.

3. For Mr. Wilson's reinstatement of employment at the same level held by him when terminated in accordance with Utah Code section 67-21-5(1) and common law.

4. For the payment of Ms. Davis's back wages, including back wages from August 2014 at the level of Associate Director UIT for Vender Partnerships, in accordance with Utah Code section 67-21-5(1) and common law.

5. For the payment of Mr. Wilson's back wages, in accordance with Utah Code section 67-21-5(1) and common law.

6. For full reinstatement of Ms. Davis's and Mr. Wilson's benefits in accordance with Utah Code Utah Code section 67-21-5(1) and common law.

7. For full reinstatement of Ms. Davis's and Mr. Wilson's other employment rights, in accordance with Utah Code section 67-21-5(1) and common law.

8. For attorney fees and costs against Defendants, pursuant to Utah Code section 67-21-5(2) and common law as consequential damages in amounts to be awarded at trial;

9. For equitable relief in the form of an indefinite suspension of the University's ability to "self-audit," ensuring that, going forward, the Utah State Auditor's office shall conduct audits of the University.

10. For pre-judgment interest on all items of special damage and for all other and further relief to which Plaintiffs may be entitled.

Dated this 2nd day of September, 2016.

HOOLE & KING, L.C.

/s/ Roger H. Hoole
Roger H. Hoole
Attorneys for Plaintiffs