IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JASMIN DAVIS and BARRY WILSON,<br><br>                    Plaintiffs,<br><br>v.<br><br>THE UNIVERSITY OF UTAH, STEPHEN HESS, STEPHEN CORBATO, LISA KUHN, MICHAEL EKSTROM, CAPRICE POST, JIM LIVINGSTON, JOHN NIXON and JEFF HERRING, sued as individuals,<br><br>                    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' MOTION TO SUPPLEMENT<br><br><br>Case No. 2:18-CV-926 TS-PMW<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Third

Amended Complaint and Plaintiffs' Motion to Supplement. For the reasons discussed below, the

Court will grant both Motions.

## I. BACKGROUND

Plaintiffs Jasmin Davis ("Davis") and Barry Wilson ("Wilson") are former employees of

the University of Utah. Plaintiffs claim they were improperly terminated as a result of

whistleblowing activities. The Court previously dismissed all of Plaintiffs' claims but allowed

them the opportunity to file a Third Amended Complaint as to their First Amendment claims.

The Individual Defendants now seek dismissal of that remaining claim.[1]

---

[1] The Court dismissed Plaintiffs' First Amendment claim against the University of Utah in its previous order. Docket No. 34, at 12–13. While Plaintiffs continue to list the University in their caption, no claims against the University remain.

Davis was hired by the University of Utah in or about August 2013 to work in the University Information Technology Department ("UIT"). She had responsibility for the Office of Software Licensing ("OSL") and reported to Lisa Kuhn ("Kuhn"), UIT's Director of Finance. In this position, Davis was responsible for ensuring all staff, students, and faculty remained in compliance with the software license agreements she managed for UIT. She was also responsible for overseeing the OSL budget, staff, marketing, website, day-to-day operations, technical support, outreach, escalations, vendor negotiations, executive support, reporting, and agreement renewals.

In March 2014, Davis was promoted to the position of Associate Director of Strategic Vendor Partnerships. That role included improving cellular coverage for the entire University. She was also tasked with special projects for which she reported to Eric Denna ("Denna"), the Chief Information Officer. These included: review of strategic agreements outside OSL; the sale/lease of space at the Downtown Data Center; the negotiation of a new campus-wide agreement with Adobe; improvement of campus-wide cellular coverage; project review of the voice-over Internet Protocol ("VoIP"); and negotiation and execution of an agreement with a vendor called BOX to provide online storage.

Wilson initially worked at the University as a contractor. By July 1, 2014, he was offered and accepted a position with UIT as a Senior Product Manager. In this position, he was responsible for UIT's Fiber Team and the Cellular/Distributed Antenna System ("DAS"). Wilson reported to Michael Ekstrom ("Ekstrom"), the Director for Common Infrastructure Services within UIT, for fiber optic cable management, installation, and communication infrastructure and had a "dotted reporting line" to Davis for cellular issues.

Davis and Wilson began reporting violations or suspected violations of law, regulations, or rules pertaining to the waste or misuse of public resources. Plaintiffs' Third Amended Complaint highlights seven categories of such reports. These include: a fabricated purchase order for Americom; failure to charge for power bills; unnecessary DAS expenditures; unauthorized amendments to campus-wide DAS/Lease Agreement; the Downtown Data Center; steering a purchase of Azure; and manhole and communications security.

Plaintiffs first reported these concerns to their immediate supervisors, Ekstrom and Kuhn. Plaintiffs allege that it was "their responsibility to bring those problems with proposed solutions to their supervisors."[2] Indeed, University policy stated that "all employees are encouraged to report suspected improprieties to their supervisor, or directly to a higher level if the supervisor is involved."[3]

After Ekstrom and Kuhn did not address Plaintiffs' concerns, they reported their concerns to the next level of UIT management, Stephen Corbato ("Corbato"), the Deputy Chief Information Officer for UIT in accordance with University policy. They also began reporting their concerns to others including, among others John Nixon ("Nixon"), the University's Senior Chief Administrative Officer and Chief Financial Officer. At the meeting with Nixon, Plaintiffs presented him with a book of their concerns and discussed those concerns with him.[4]

Plaintiffs allege that their actions displeased UIT leadership, particularly Corbato and as a result, Corbato and Kuhn began to retaliate against them. In particular, Plaintiffs allege that Davis was denied a promotion and salary adjustment by Kuhn and Corbato.

---

[2] Docket No. 35 ¶ 27.

[3] *Id.* ¶ 28; *see also* Docket No. 4-2, at 24.

[4] Docket No. 4-2, at 26–97.

Plaintiffs again met with Nixon on October 30, 2014. On that same day, Corbato allegedly told Ekstrom that Wilson was a "cancer that needed to be cut out."[5] Soon thereafter, Corbato changed Wilson's reporting line so that he no longer reported to Davis. Ultimately, Wilson was terminated on December 15, 2014, by Ekstrom and Corbato.[6]

After Wilson was terminated, Davis met with Stephen Hess ("Hess"), the University's Chief Information Officer. Davis presented Hess with a copy of the book Plaintiffs had provided to Nixon and a second book that included Davis' concerns with UIT leadership and the termination of Wilson.[7]

Wilson also continued his efforts after his termination. Between January and April 2015, Wilson contacted a state senator, the Utah Taxpayers Association, and the Utah State Auditor. Davis alleges she was blind copied on these emails.

In May 2015, Davis brought her concerns to the University's Internal Audit department. She also responded to an email that Wilson sent to various individuals, both inside and outside the University.[8]

On July 13, 2015, Wilson sent an email to the Huntsman Cancer Institute in hopes that it would reach Jon Huntsman or his assistant. Wilson complained about the incident where

---

[5] Docket No. 35 ¶ 36.

[6] Docket No. 4-3, at 19.

[7] *Id.* at 26–168.

[8] Docket No. 4-21, at 1.

Corbato referred to him as a "cancer."[9]  The email made it to Mr. Huntsman's assistant.

Thereafter, Davis emailed Mr. Huntsman's assistant to thank her for helping.[10]

On July 20, 2015, Kuhn provided Davis a letter of expectation.  The letter chastised Davis for reaching out to one of the University's most important donors—presumably, Huntsman—to seek help on a "workplace issue."[11]  The letter also referenced the ongoing internal audit.

Sometime in July 2015, Wilson was hired as an independent contractor by the University Auxiliary Services Group.  Wilson was responsible for overseeing the installation of cell-sites at Rice Eccles Stadium.  He was again terminated on August 25, 2015.  Plaintiffs allege that Wilson was informed "that UIT management had discovered he was working for the University again, were displeased, and, as a result, Mr. Wilson could no longer work on these projects."[12]

Plaintiffs allege that they continued to voice their concerns.  In particular, Wilson communicated with the Utah Attorney General's Office, the Governor's office and various media outlets in July, August, and September of 2015.[13]

On September 22, 2015, Kuhn, with the concurrence of Hess, notified Davis that she would be separated from her employment effective October 23, 2015.[14]  Davis later applied for a different position at the University but was rejected.

---

[9] Docket No. 4-18, at 12.

[10] *Id.* at 14.

[11] Docket No. 4-4, at 13.

[12] Docket No. 35 ¶ 55.

[13] Docket No. 4-18, at 19–22; Docket No. 4-19, at 1–3.

[14] Docket No. 4-1, at 7.

## II.  MOTION TO DISMISS STANDARD

In considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiffs as the nonmoving party.[15]  Plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face,"[16] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[17]  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[18]

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[19]  As the Court in *Iqbal* stated,

> [o]nly a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.[20]

---

[15] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[16] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[17] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[18] *Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

[19] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[20] *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted).

In considering a motion to dismiss, a district court not only considers the complaint, "but also the attached exhibits,"[21] the "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[22] The Court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."[23]

## III. MOTION TO SUPPLEMENT

Before addressing the merits of the Motion to Dismiss, the Court addresses Plaintiffs' Motion to Supplement. The Court previously granted a motion to dismiss while allowing Plaintiffs the opportunity to file a Third Amended Complaint with respect to their First Amended claim. In their previous motion to dismiss, Defendants made a number of arguments in favor of dismissal. The Court only addressed one argument—that Plaintiffs had failed to adequately plead personal participation by Defendants—and did not reach the merits of the other issues. The Court, however, allowed for Defendants to reassert those issues in another motion to dismiss.

In their Motion to Dismiss, Defendants have done just that. In their Response to the Motion, Plaintiffs focus on the single issue that was the focus of the Court's previous Order: personal participation. Plaintiffs stated that they would rely on their previous opposition to address the remaining issues. In their Reply, Defendants argue that the Court should not

---

[21] *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011).

[22] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[23] *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

consider the prior briefing and that Plaintiffs have waived any arguments not addressed in their Response.

This prompted Plaintiffs to file their Motion to Supplement, formally asking the Court to consider their previous briefing. Defendants oppose this request, arguing that the Motion to Supplement "interjects an inherent unfairness into these proceedings."[24]

The Court disagrees with Defendants' assertion. The Court finds that it was reasonable for Plaintiffs to focus on the single issue the Court identified in its prior Order, while relying on their prior briefing on the remaining issues. Defendants fail to demonstrate any prejudice in doing so and, to the extent that there is any such prejudice, it can be ameliorated by consideration of all the prior briefing. Thus, the Court will grant the Motion to Supplement and has considered all the briefing in this case in deciding the Motion to Dismiss.

## IV. DISCUSSION

### A. PERSONAL PARTICIPATION

As explained in the Court's previous Order, to state a claim under 42 U.S.C. § 1983, a complaint must allege personal participation by the defendant.[25] Such personal participation must be alleged by showing an affirmative link between the defendant and the challenged conduct, either through the defendant's actual conduct or the defendant's acquiescence in a constitutional violation.[26] Thus, a complaint must "make clear exactly *who* is alleged to have

---

[24] Docket No. 56, at 2.

[25] *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir. 1976).

[26] *Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *Kite v. Kelley*, 546 F.2d 334, 337 (10th Cir. 1976).

done *what to whom*."[27]  "[I]t is incumbent upon a plaintiff to 'identify *specific* actions taken by *particular* defendants' in order to make out a viable § 1983 . . . claim."[28]

Here, there are sufficient allegations that certain Defendants actually participated in the challenged conduct.  For example, Ekstrom and Corbato are alleged to have participated in the termination of Wilson; Kuhn and Corbato were allegedly involved in the failure to promote Davis; and Kuhn and Hess provided the letter to Davis informing her of her separation.  However, there are insufficient allegations that the other Defendants personally participated in the alleged constitutional violations.  While Plaintiffs contend that these Defendants acquiesced in the conduct of the other Defendants, these allegations are conclusory and unsupported.  At most, Plaintiffs allegations reveal that these Defendants were among many with whom Plaintiffs shared their concerns.  This is not sufficient.  Therefore, dismissal of Defendants Post, Livingston, Nixon, and Herring is appropriate on this ground.

## B.    QUALIFIED IMMUNITY

Defendants also seek dismissal on qualified immunity grounds.  "Qualified immunity exists to protect government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[29]  Once a defendant invokes qualified immunity, the plaintiff bears the burden of demonstrating: "(1) the defendant violated a constitutional right and (2) the

---

[27] *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008).

[28] *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998)).

[29] *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010)).

constitutional right was clearly established."[30] "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity."[31] The Court will address the claims brought by each Plaintiff separately.

1. *Davis*

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."[32] Such claims are analyzed using the *Garcetti/Pickering* analysis.[33]

> The test comprises five elements, called "prongs": (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.[34]

"The first three steps of the *Garcetti/Pickering* analysis are issues of law 'to be resolved by the district court, while the last two are ordinarily for the trier of fact.'"[35]

Under the first prong, if the speech occurred pursuant to a public employee's official duties, the inquiry ends.[36] In determining whether speech is made pursuant to an employee's official duties "the Tenth Circuit has taken a case-by-case approach, looking both to the content

---

[30] *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

[31] *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

[32] *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

[33] *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007).

[34] *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009).

[35] *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010) (quoting *Brammer-Hoelter*, 492 F.3d at 1203).

[36] *See Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir. 2008).

of the speech, as well as the employee's chosen audience."[37]  "There are no bright line rules to

make this determination."[38]  Instead, the Tenth Circuit takes "a broad view of the meaning of

speech that is pursuant to an employee's official duties."[39]

> [T]he court has focused on whether the speech activity stemmed from and was of
> the type that the employee was paid to do and has highlighted that the ultimate
> question in determining whether speech falls within an employee's official duties
> is whether the employee speaks as a citizen or instead as a governmental
> employee.[40]

"Consequently, if an employee engages in speech during the course of performing an official

duty and the speech reasonably contributes to or facilitates the employee's performance of the

official duty, the speech is made pursuant to the employee's official duties."[41]

Plaintiffs made statements to essentially three separate groups: their superiors within

UIT; individuals outside UIT but within the University; and individuals outside the University.

Plaintiffs' communications with their supervisors and others within UIT clearly fall within their

official duties.  The Tenth Circuit has noted that "speech directed at an individual or entity

within an employee's chain of command is often found to be pursuant to that employee's official

duties."[42]  All of Plaintiffs' concerns were discovered as part of their assigned duties and

directly related to the types of activities they were paid to do.  Indeed, Plaintiffs themselves

repeatedly allege that by communicating to these individuals, they "were simply performing the

functions for which they had been hired" and "were also reporting the waste and misuse of

---

[37] *Rohrbough*, 596 F.3d at 746.

[38] *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010).

[39] *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008).

[40] *Rohrbough*, 596 F.3d at 746 (internal quotations and citations omitted).

[41] *Brammer-Hoelter*, 492 F.3d at 1203.

[42] *Rohrbough*, 596 F.3d at 747.

taxpayer money as University employees are encouraged to do by policy."[43]  An examination of the relevant facts surrounding these reports supports this statement.  Thus, these statements are not constitutionally protected.

Plaintiffs' statements to those outside their direct chain of command but still within the University are the same.  Plaintiffs discovered alleged improprieties while performing duties with which they were tasked.  Plaintiffs reported their concerns to their direct supervisors.  When they received unsatisfactory responses from their superiors, they elevated their concerns to various individuals and entities within the University.  Plaintiffs did so because they believed such actions were either required or encouraged by University policy.  Thus, Plaintiffs' actions in elevating their concerns stemmed from and were the type of activities they were paid to do.  The fact that they went "outside of their ordinary chain of command does not necessarily insulate their speech."[44]

Davis' statements outside the University are limited.  On July 15, 2015, Davis responded to an email from the Huntsman Corporation after Wilson reported being called a "cancer."[45] This is the type of workplace grievance that is not a matter of public concern and, thus, not constitutionally protected.[46]   Therefore, the Court need not determine whether Davis was speaking pursuant to her official duties in this email.  The other instance of Davis personally making statements is when she responded to an email that Wilson had sent to the Internal Audit

---

[43] Docket No. 35 ¶ 93; *see also id.* ¶¶ 27, 28, 102, 114, 116, 175, 185, 186, 238, 242.

[44] *Rohrbough*, 596 F.3d at 747.

[45] Docket No. 4-18, at 14.

[46] *Brammer-Hoelter*, 492 F.3d at 1205 (stating that "speech that simply airs grievances of a purely personal nature typically does not involve matters of public concern") (internal quotation marks omitted).

Department. Included on this email were others, both inside and outside the University.[47] This email, though it included individuals outside of the University, nonetheless stemmed from the type of activities Plaintiff was paid to do. In particular, it raised the same issues surrounding cell coverage that made up some of Plaintiff's internal complaints. Therefore, this email is not constitutionally protected and Davis has failed to state a claim under the First Amendment.

Even if Davis could state a constitutional violation, Defendants are nonetheless entitled to qualified immunity because Davis has not shown that it was clearly established that her speech was outside her official duties. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[48] "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation."[49] "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[50] "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[51]

When it comes to determine whether the right at issue was clearly established, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."[52] "The dispositive question is whether the violative nature of particular

---

[47] Docket No. 4-21, at 1–2.

[48] *Mullenix v. Luna*, ---U.S.---, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

[49] *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017).

[50] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[51] *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[52] *Id.* (internal quotation marks omitted).

conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."[53] "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'"[54]

Plaintiffs cite to *Casey v. West Las Vegas Independent School District*,[55] where the Tenth Circuit stated: "It has long been established law in this circuit that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action."[56] Plaintiff relies on this statement to argue that the right at issue was clearly established. However, this statement is the type of high-level generality that the Supreme Court and the Tenth Circuit have specifically eschewed.

For example, in *Knopf v. Williams*,[57] a case cited heavily by Plaintiffs, the Tenth Circuit emphasized the need for a particularized showing. There, "[t]he district court's discussion of the second qualified immunity prong consisted only of the general statement that 'it is clearly established that a public employer cannot retaliate against an employee for exercising their First Amendment right to free speech.'"[58] The Tenth Circuit found this general statement of law

---

[53] *Id.* (internal quotation marks and citation omitted).

[54] *White v. Pauly*, ---U.S.---, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

[55] 473 F.3d 1323 (10th Cir. 2007).

[56] *Id.* at 1333–34.

[57] 884 F.3d 939 (10th Cir. 2018).

[58] *Id.* at 946.

insufficient as it "merely repeat[s] the generic *Garcetti/Pickering* standard."[59]  Instead, for a plaintiff to meet their burden, "the clearly established law must be particularized to the facts of the case."[60]

    In an effort to meet her burden, Plaintiff points to the facts of *Casey*.  Ms. Casey served as the superintendent of the Las Vegas Independent School District.  Upon becoming superintendent, she assumed responsibility for the District's Head Start program, a federally funded initiative.  Ms. Casey reported issues concerning the Head Start program's lack of compliance with federal regulations to members of the school board and she instructed a subordinate to report certain violations to the federal Head Start office.  In addition, Ms. Cassey reported concerns to the school board, and eventually the state attorney general, that the board was violating the state's open meetings law.

    The Tenth Circuit found that Ms. Casey's statements with respect to the Head Start program were made pursuant to her official duties and, therefore, did not provide a basis for a First Amendment Claim.  "[T]hese comments were directed only to her supervisors and, in each instance, Ms. Casey sought to raise concerns about the legality of the District's operations."[61]  "[B]ecause advising her employer on 'the lawful and proper way to conduct school business' was admittedly part of her portfolio, we cannot help but conclude that Ms. Casey made these statements pursuant to her official duties."[62]

---

[59] *Id.* at 947.

[60] *Id.* (quoting *White*, 137 S. Ct. at 552).

[61] *Casey*, 473 F.3d at 1329.

[62] *Id.*

The court divided Ms. Casey's comments about the open meetings violations into two types: those made to the board and those made to the attorney general. "With respect to Ms. Casey's statements directed to the Board, it seems to us significant that they were made solely to her superiors and Ms. Casey, as Superintendent, had a duty to provide candid advice and counsel to the Board, much as any corporate CEO might to his or her board of directors."[63] Thus, they did not provide a basis for a claim.

However, the statements made to the attorney general were "another kettle of fish."[64] "In the first place, Ms. Casey was not seeking to fulfill her responsibility of advising the Board when she went to the Attorney General's office. Just the opposite: she had lost faith that the Board would listen to her advice so she took her grievance elsewhere."[65] But the fact that Ms. Casey took her complaints beyond the board was not dispositive because she "also took her complaints about the Head Start program to outside authorities."[66] Rather, the important fact was that there was no evidence that Ms. Casey was responsible for the boards' meeting practices. The court stated:

> But, very much unlike the administration of the Head Start program that the Board committed to her care and pursuant to which she had independent responsibilities to the federal government, we have no evidence in the summary judgment record before us suggesting that the Board or any other legal authority ever assigned Ms. Casey responsibility for the Board's meeting practices. Rather, the evidence before us suggests that the Board members alone were responsible for making certain their meetings complied with New Mexico law at the time.[67]

---

[63] *Id.* at 1332.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

Thus, her conduct reporting to the attorney general fell sufficiently outside the scope of her office to survive. As was explained in a later case, "[i]t was when Casey went beyond her supervisors and reported to someone outside her chain of command *about a matter which was not committed to her care* that we found that her speech was protected by the First Amendment."[68]

Plaintiff here makes much of the fact that she went outside her chain of command. However, this is not dispositive.[69] Rather, as the facts of *Casey* make clear, it was that Ms. Casey went outside her chain of command on a matter for which she was not responsible that took her statements outside her official duties. That was not the case here. All of Davis' statements related directly to matters for which she was responsible.

This makes this case much more like *Knopf*, where the Tenth Circuit found that defendant was entitled to qualified immunity because the law was not clearly established. The plaintiff in *Knopf* was the former city planner in Evanston, Wyoming. The plaintiff worked as the city planner for over thirty years and had a number of significant responsibilities related to a public works project. The plaintiff became concerned about a portion of the project and voiced his concerns in an email to the city attorney. After informing the mayor about his concerns and his email to the city attorney, the plaintiff was informed that he would not be reappointed as city planner. The mayor stated that the plaintiff's email to the city attorney was unacceptable and that he had lost confidence and trust in him. The plaintiff brought suit alleging that he was retaliated against for exercising his First Amendment rights.

---

[68] *Thomas*, 548 F.3d at 1325 (emphasis added).

[69] *Rohrbough*, 596 F.3d at 747.

The Tenth Circuit found that the plaintiff had failed to meet his burden of demonstrating that the law was clearly established. The court stated that "[t]he key question is whether Mayor Williams 'reasonably [could] have believed, at the time he fired [Mr. Knopf], that a government employer could fire an employee on account of speech stemming from almost 30 years of high-level involvement with an ongoing project.'"[70] The court found that the plaintiff had failed to make this showing. "Because it would not have been 'beyond debate' to a reasonable official that Mr. Knopf's email exceeded the scope of his official duties," the mayor was entitled to qualified immunity.[71]

The same result is warranted here. Davis has failed to show that it was beyond debate that her statements exceeded the scope of her official duties. This is especially true given the scope of her duties.

This case also has similarities to another case relied upon by Plaintiffs: *Green v. Board of County Commissioners*.[72] In that case, the plaintiff worked as a drug-lab technician and detention officer. The plaintiff's primary duties were in the drug lab and, as part of her job, she performed drug-screening tests. The plaintiff was concerned that her employer did not have a confirmation testing policy. She raised these concerns to her direct supervisor and a state court judge, but neither was responsive to the issue. After she was concerned that a particular test was a false positive, the plaintiff contacted the manufacturer of the drug equipment and arranged for a confirmation test by an outside hospital. She also spoke with representatives of the Department of Human Services. The confirmation test showed that the initial test was a false positive. The

---

[70] *Knopf*, 884 F.3d at 949 (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)).

[71] *Id.* at 950.

[72] 472 F.3d 794 (10th Cir. 2007).

plaintiff communicated this to her supervisor and the employer adopted a formal confirmation policy. After this, however, the plaintiff alleged that her supervisors began treating her less favorably and she was ultimately terminated.

The plaintiff brought suit alleging that her employer had violated her First Amendment rights. The Tenth Circuit found that arranging the confirmation test, "even if not explicitly required as part of her day-to-day job responsibilities," "stemmed from and were the type of activities that she was paid to do."[73] The court noted that "it was part of her job to ensure that the testing machines were working correctly, and it was part of her job to interact with her supervisors, clients, and third parties regarding testing policies and issues."[74] Because the plaintiff's "communications with third parties about confirmation testing are the types of communications that would be attributable to [her employer]," her employer had "an interest in controlling them."[75] Thus, "in connection with the unauthorized confirmation test, Ms. Green did not speak or act in her capacity as a citizen, but as a government employee."[76]

The same is true here. All of the statements that can be attributed to Davis stemmed from and were the type of activities she was paid to do. Thus, she has failed to show that it was clearly established that her speech fell outside her official duties.

2.    *Wilson*

Wilson's claim, as it relates to his statements made prior to his initial termination, suffers from the same flaws as Davis' claim and is subject to dismissal for the same reasons. Wilson's

---

[73] *Id.* at 800–01.

[74] *Id.* at 801.

[75] *Id.*

[76] *Id.*

statements made after his initial termination, however, are another story. It is difficult to suggest that any such statements were made pursuant to his official duties because, after he was terminated, he had no official duties. Moreover, while Defendants make much of Plaintiffs' broad responsibilities, this was not true of Wilson's second term of employment. Wilson's second term of employment was limited to overseeing the installation of cell-sites at Rice Eccles Stadium. The statements he made after his initial termination did not relate to the work he was paid to do during this second term of employment. Thus, Plaintiffs have sufficiently alleged that the statements Wilson made on or after January 2015 were not made pursuant to his official duties.

Defendants argue that none of Plaintiffs' statements were of matters of public concern. While the Court agrees that not all of Wilson's statements were matters of public concern, it is clear that at least some of the statements made by Plaintiffs were. Wilson raised issues of fraud, waste, misuse of public resources, and violations of statutes, rules, and regulations. The Supreme Court has made clear that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance."[77] Based upon this, the Court finds that Plaintiffs have plausibly alleged that Wilson's statements to a state senator, the Utah Taxpayers Association, the Utah State Auditor, the Governor, and various media outlets were constitutionally protected. But this does not end the inquiry.

"[T]he fourth step of the *Garcetti/Pickering* test for First Amendment retaliation claims requires the plaintiff to show a causal connection between the protected speech and an adverse

---

[77] *Garcetti*, 547 U.S. at 425.

action."[78]  A plaintiff must demonstrate "that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment."[79]

Here, there are insufficient allegations that Defendants were aware of Wilson's protected statements or that there was any connection between those statements and Wilson's second termination.  Plaintiffs vaguely allege that "UIT management" was somehow involved in his termination, but they do not explain how.[80]  Plaintiff attempts to link Nixon to Wilson's second termination, but the materials they cite do not mention Nixon, nor do they suggest he had any role in Wilson's termination.[81]  Instead, it appears that a decision was made not to re-hire Wilson at the time of his initial termination.  In an email from Kuhn to Davis dated January 7, 2015, Kuhn stated that UIT would "not use Barry as a contractor" and she did not "want other departments in coordination with UIT (supporting DAS) to be involved with using Barry as a contractor."[82]  She went on to state that "Barry should also not be providing any assistance that could be perceived as a chargeable service being provided."[83]  It appears the decision to terminate Wilson a second time was based on the determination that he not be re-hired, not any protected statements.  Thus, even if Wilson could meet the first two elements, he fails on the

---

[78] *Singh v. Cordle*, 936 F.3d 1022, 1044 (10th Cir. 2019).

[79] *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1236 (10th Cir. 2009).

[80] Docket No. 35 ¶¶ 55, 251.

[81] *See* Docket No. 4-4, at 14–17.

[82] *Id.* at 14.

[83] *Id.*

fourth because there are insufficient allegations to link his protected statements to his second termination.

## V. CONCLUSION

It is therefore

ORDERED that Defendants' Motion to Dismiss (Docket No. 46) and Plaintiffs' Motion to Supplement (Docket No. 55) are GRANTED.

DATED this 9th day of March, 2020.

BY THE COURT:

_____
Ted Stewart
United States District Judge